35 Cal.2d 760 (1950)
YOUNG MEN'S CHRISTIAN ASSOCIATION OF LOS ANGELES, Plaintiff and Appellant,
v.
COUNTY OF LOS ANGELES et al., Defendants and Appellants.
L. A. No. 21208. 
Supreme Court of California. In Bank. 
Aug. 18, 1950.
 Brady & Nossaman and Walter L. Nossaman for Plaintiff and Appellant.
 Henry C. Clausen, Amicus Curiae on behalf of Plaintiff and Appellant.
 Harold W. Kennedy, County Counsel, Andrew O. Porter, Deputy County Counsel, Ray L. Chesebro, City Attorney, and Louis A. Babior, Deputy City Attorney, for Defendants and Appellants.
 SPENCE, J.
 Plaintiff, the Young Men's Christian Association of Los Angeles, brought this action to recover certain taxes and assessments paid under protest for the taxable year 1946-1947. The controversy involves the application of the recently enacted welfare exemption law (Cal. Const., art XIII, 1c; Rev. & Tax. Code, 214) to five buildings owned by plaintiff and used in carrying on its work. The county assessor refused to exempt from taxation such portions of plaintiff's buildings as were used for dormitories, restaurant and dining-room accommodations, barber shops, valet shops, a particular type of merchandise store, and office space rented to a government agency; and, in addition, he deemed each of plaintiff's pieces of property liable for a Los Angeles County Flood Control District assessment.
 The cause was tried upon an agreed statement of facts, and by the judgment thereupon entered plaintiff's exemption claims were sustained as to the tax payments made on the disputed portions of its buildings but denied as to the flood control district assessments made against its property. The judgment is assailed by both parties, defendants having appealed from that portion allowing plaintiff a refund of the tax payments, and plaintiff having appealed from that portion disallowing recovery of the flood control district assessments.
 Various aspects of the scope of the welfare exemption law in relation to particular claimants seeking the benefits thereof have been discussed in the case of Cedars of Lebanon Hospital v. County of Los Angeles, L. A. No. 20610, this day filed, ante, p. 729 [221 P.2d 31], and reference is made to such opinion for such bearing as it may have on the consideration of *762 the general problem. The parties have resolved their controversy here to turn principally on these points: (1) whether the portions of the buildings in question, as property belonging to plaintiff, concededly a nonprofit organization, were "used exclusively for religious ... or charitable purposes" as a basic prerequisite (Const., art. XIII, 1c; Rev. & Tax. Code, 214), and (2) the effect of the further proviso that the "property [be] not used or operated by the owner ... for profit regardless of the purposes to which the profit is devoted" (Rev. & Tax. Code, 214, subd. (3)). Upon an analysis of the agreed factual basis of plaintiff's several exemption claims, it appears that plaintiff (1) properly invoked the "welfare exemption" with respect to the tax levy made on the dormitory facilities it furnished in its respective buildings but (2) was not entitled to such exemption with respect to (a) tax levies made on the restaurant and dining-room accommodations, barber shops, valet shops, the particular merchandise store involved, and the office space rented to the government agency; or (b) flood control district assessments made against its property.
 The record identifies the five buildings owned by plaintiff as the Downtown Branch, San Pedro Branch, Hollywood Branch, 28th Street Branch, and East Los Angeles Branch. In each instance exemption was accorded generally to the portions of these buildings devoted to locker rooms, swimming pools, gymnasiums, club rooms, social rooms, classrooms, storage and maintenance rooms; and the parties are in dispute only as to the tax status of the following physical facilities in their respective locations:
 (1) Downtown Branch, an 11-story structure, with basement and subbasement, and situated in the central business section of Los Angeles: dormitory rooms provided on the sixth to tenth floors; a small barber shop; and a valet shop. These two shops are located in a small adjoining structure, each having entrances from the street and through a court from the lobby of the main building. The valet shop maintains a small room on the basement level in the main building for the performance of its cleaning and pressing services. Both shops serve the public, as well as dormitory residents and Y.M.C.A. members generally. The barber shop is operated by Y.M.C.A. employees, who are paid by plaintiff on the basis of an agreed percentage of the gross receipts. The valet shop is operated by an independent contractor, who pays plaintiff *763 a monthly rental of $100. The charges made by both shops for their services are equivalent to standard commercial prices in the community.
 (2) San Pedro Branch, a five-story structure, with a basement, and situated close to the business center and harbor channel of San Pedro: dormitory rooms provided on the third to fifth floors, and also a portion of the second floor; a restaurant on the first floor, a room approximately 1,600 square feet in area, with counters and seats accommodating 38 persons and 7 tables serving 28 persons--66 persons in all; Cluverius Hall, a special meeting room on the second floor containing an area of 1,800 square feet and used by non-Y.M.C.A. groups, where meals are served to a maximum of 100 people in conjunction with scheduled meetings; a barber shop and a valet shop, each located at the rear of a small court in the interior of the building and reached only through the main lobby; and a small store located in the rear of the first floor, and without a direct street entrance.
 The restaurant is operated by Y.M.C.A. employees, and meals are served to the general public, as well as to resident and nonresident Y.M.C.A. members, with a price range of 45 cents to 95 cents for breakfast and 70 cents to $1.05 for lunch and dinner. In Cluverius Hall meals are served to various civic groups at a charge varying from $1.00 to $1.50 per person, according to the choice of menu. Both the barber shop and the valet shop are open to the public, as well as to dormitory residents and Y.M.C.A. members generally. The barber shop is operated by an independent contractor, who pays plaintiff a weekly rental of $10. The valet shop is operated by a Y.M.C.A. employee, a tailor, whose compensation consists in a fixed percentage of the gross receipts. In both shops standard prices prevail. The small store was started as a "gym store" for the sale of athletic equipment and clothing pursuant to plaintiff's uniform policy to provide such merchandise for use in athletics at all branches having gymnasium, swimming or similar physical training facilities. This particular store was so operated since the opening of the present building in 1926, but during World War II as a convenience to the large number of servicemen visiting the San Pedro Branch, the store began to stock various other items of merchandise, principally toilet articles, drugs, and various kinds of trinkets and curios. This augmented line of purchasable articles was still being offered in the store during *764 1946, the tax year in question, but apparently was allowed to dwindle in 1947 and 1948, at which time the stock of the store returned to its prewar status as a true "gym store."
 (3) Hollywood Branch, a four-story structure and situated in the center of Hollywood: dormitory rooms provided mainly on the third and fourth floors, with a few accommodations on the second floor.
 (4) 28th Street Branch, a four-story structure, with a basement, and situated near Central Avenue in a district in Los Angeles populated largely by Negroes: dormitory rooms provided mainly on the third and fourth floors, with some rooms also on the second floor.
 (5) East Los Angeles Branch, a two-story structure, with a separate gymnasium building in the rear, and situated in the eastern part of Los Angeles: dormitory rooms provided on the second floor; three office rooms on the first floor, having a total area of 1,122 square feet and rented to the Selective Service Board, originally at a rental beginning in 1943 of $25 per month but increased in December, 1945, to $100 per month and so continued until the occupancy of the board was terminated in December, 1946.
 Plaintiff follows a general pattern in the operation of the dormitory facilities in its respective branches: in each instance the dormitory area is under the supervision and management of a trained Y.M.C.A. secretary, who also has the additional responsibility of acting as a counsellor and advisor to the branch's residents. Applicants for living quarters are required to fill out a written form of questionnaire giving information as to background, experience, and character of the individual and declaring his agreement with the fundamental purposes of the Y.M.C.A. Each applicant is interviewed by the supervising secretary at the branch and told about the organizational policy of the Y.M.C.A., its general objectives in making available various facilities and activities as part of its regular program, and the prevailing standard of good conduct and moral behavior that must be followed. All accepted applicants for residence are required to become members of the Y.M.C.A. An effort is made to confine dormitory residence to men under 40 years of age, but exceptions are made on occasions. Loans are made to those who are without funds, coincident with arrangements for their stay at the branch for a reasonable period of time on credit and until they can get established. The rooms are rented at moderately low rates, consistent with their modest furnishings *765 and limited size, ranging according to the branch from $4.50 to $7.00 per week for singles; $4.50 to $6.50 per week, two in a room; and $3.50 to $5.50 per week, three in a room.
 Plaintiff's financial records appear to make no breakdown or allocation of general and administrative overhead expenses pursuant to the various activities or facilities provided at each branch, but the total expenditures thereof are lumped together as against total operating expense. Such accounting procedure shows that plaintiff during its entire existence has functioned at an overall loss, and that the aggregate deficit is discharged yearly by individual contributions and an allowance from the Community Chest. All the original cost of plaintiff's buildings and the furnishings thereof was met by voluntary contributions, and without resort to operating income or receipts. Plaintiff's annual budget makes no allowance for the depreciation of buildings, fixtures or equipment. In view of these accounting practices, and particularly the failure to segregate income and expense items as to specific facilities, it is impossible to determine precisely from the standpoint of profit or loss the financial results of dormitory, restaurant or other designated departmental operations considered separately. However, it is clear that the revenues derived from plaintiff's dormitory facilities as provided at each branch constitute a substantial source of operating income. Furthermore, the most significant of plaintiff's exemption claims involves the dormitory areas in that at least 90 per cent of the total disputed tax assessment in each case is attributable to such residential facilities.
 Plaintiff's general object and purpose, as stated in its articles of incorporation, is to promote "the spiritual, moral, mental and physical condition of youth and adults"--to bring them under moral and religious influences, to improve their characters, and to stimulate in them higher ideals of life and conduct. From the agreed statement of facts it appears that plaintiff's "activities include physical education, sports, recreation, teaching of skills, informal educational activities, social and cultural activities, religious and moral instruction and guidance, worship and inspirational occasions." In addition, plaintiff cites certain specialized functions of its respective branches determined in large part by their particular location: Downtown Branch, with its metropolitan administration and facilities for individuals and groups in the central business area who would not be served by any particular *766 outlying Y.M.C.A. branch; San Pedro Branch, with its focus upon the needs and activities of members of the Armed Forces stationed temporarily or permanently in the Harbor district--in fact, known as the "Army and Navy Branch"; Hollywood Branch, with its emphasis upon service and assistance to young men brought to that area in quest of employment with the motion picture and radio industries; 28th Street Branch, with its activities gauged to serve members of the Negro race settled in that locale; and East Los Angeles Branch, with its facilities used primarily in serving members of several minority racial groups located in that area. Plaintiff's general policy is established by a board of directors, and the administrative operations thereunder are supervised by a board of managers functioning at each branch. The members of these respective boards are citizens of the community who serve without compensation. Salaries, of course, are paid to plaintiff's staff of trained secretaries and their assistants in the administration of plaintiff's policies, as well as to the personnel employed by plaintiff in maintaining the various branches and supplying the services there rendered.
 Plaintiff contends that the abovementioned facilities on which it seeks the welfare exemption are all being used for the purpose of carrying on its broad, diversified program as a religious and charitable institution, organized on a nonprofit basis to serve the moral, mental, and physical needs of young men and aid in the development of their characters for the general benefit of society, and that as integral parts of the single, overall Y.M.C.A. program in the advancement of its fundamental objectives, all such operations qualify within the law's requirement of "property used exclusively for religious ... or charitable purposes." Defendants, on the other hand, maintain that the disputed facilities are used for commercial revenue- producing purposes, and the fact that "plaintiff is a charitable corporation and devotes the profit, if any, from [its] business operations to charitable purposes ... is not sufficient to entitle it to tax exemption on ... purely commercial enterprises." As heretofore stated, we have concluded that plaintiff's position is well taken with respect to the portions of its buildings devoted to dormitory accommodations as constituting facilities which are incidental to and reasonably necessary for the accomplishment of its charitable and religious purposes, but that the other disputed facilities and undertakings by plaintiff, while undoubtedly valuable in *767 its general operational plan, do not appear to meet the conditions set forth in the welfare exemption law.
 [1] As discussed in the opinion this day filed in the case of Cedars of Lebanon Hospital v. County of Los Angeles, L. A. No. 20610, ante, p. 729 [221 P.2d 31], in connection with the claims of certain hospitals seeking the benefits of the welfare exemption, the rule of strict construction generally applicable to tax exemption laws must prevail here, but adherence to such legal principle does not require that the narrowest possible meaning be given to the exempting language if it would establish too severe a standard and defeat the apparent object of the law. Rather the construction of the law, though strict, must also be reasonable. To this end it would appear that the exemption of property "used exclusively for ... charitable purposes," like the exemption of property "used exclusively for ... religious [or] hospital purposes," should be held to include property used exclusively for any facility which is incidental to and reasonably necessary for the accomplishment of such purposes. Accordingly, plaintiff's respective facilities and activities must be examined as a whole, as well as separately, in determining the qualification of each portion of its properties for a tax exempt status.
 [2] The dormitory accommodations furnished at plaintiff's respective branches appear to be a reasonably necessary facility in carrying out plaintiff's general program and to constitute a base of operations from which radiate its commonly recognized influences and teachings directed to the elevation and betterment of young men and boys. Through operation of its dormitories, plaintiff makes available safe, clean, wholesome living quarters and environment--particularly for young men who are away from home and in need of low-cost housing within their means while they endeavor to establish themselves in the community--and likewise provides complete recreational facilities as well as opportunities to participate in activities intended to promote moral and spiritual well-being. Functioning as a nonsectarian institution and rendering its services without discrimination as to creed or race in line with its endeavors to inculcate Christian standards of character and conduct in the young men coming within its benevolent influences, plaintiff summarizes its activities to include "physical education, sports, recreation, teaching of skills, informal educational activities, social and cultural activities, religious and moral instruction and guidance, worship and inspirational *768 occasions." All applicants for lodging in any of plaintiff's branches are required to complete a questionnaire setting forth their background and experience, and declaring the desire to "become a member and support [the] aims and purposes" of the "Young Men's Christian Association as a worldwide Christian Fellowship, dedicated to developing and improving the spiritual, social, mental and physical life of youth and adults in accordance with [Christian] spirit and teachings."
 Defendants argue that even though plaintiff's maintenance of dormitory facilities be regarded as aiding in the accomplishment of its fundamental purposes, such property also serves in another capacity through satisfying a housing need for the residents at a prescribed rental, a consideration which is not only commercial in character as opposed to an extension of charity, but which likewise precludes classification as property "used exclusively for ... charitable purposes." As authority for their argument defendants rely heavily on the decision reached in Young Men's Christian Ass'n of Germantown v. City of Philadelphia (1936), 323 Pa. 401 [187 A. 204]. In that case the tax exemption applied to "all ... associations and institutions of learning, benevolence, or charity, with the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, founded, endowed, and maintained by public or private charity." (Emphasis added.) The Supreme Court of Pennsylvania analyzed the dormitory accommodations as there provided at moderate rental rates to constitute no more than the operation of a competitive hotel or residential facility, and as such commercial enterprise, not entitled to the tax exemption. However, these precise factors are to be noted as influencing that decision: (1) the concept of charity as confined solely to the relief of the needy and destitute (187 A. 209) rather than comprehending as well activities which are humanitarian in nature and rendered for the general improvement and betterment of mankind, though the recipients of such benefits may be able to pay at least in part therefor (Estate of Henderson (1941), 17 Cal.2d 853, 857-858 [112 P.2d 605]; Scripps Memorial Hospital, Inc. v. California Emp. Com. (1944), 24 Cal.2d 669, 676 [151 P.2d 109, 155 A.L.R. 360]; also Y.M.C.A. of Lincoln v. Lancaster County (1921), 106 Neb. 105 [182 N.W. 593, 595, 34 A.L.R. 1060]; Springfield Y.M.C.A. v. Board of Assessors (1933), 284 Mass. 1 [187 N.E. 104, 106]; People v. Y.M.C.A. of Chicago (1936), 365 Ill. 118 [6 N.E.2d 166, 169]; Miami *769 Battlecreek v. Lummus (1939), 140 Fla. 718 [192 So. 211, 218]; Missouri Goodwill Industries v. Gruner (1948), 357 Mo. 647 [210 S.W.2d 38, 40]; People v. Chambers (1949), 88 N.Y.S.2d 459, 467); (2) the exemption qualification premised on the narrow consideration of whether the maintenance and operation of the dormitory rooms were clearly "necessary to the occupancy and enjoyment" of that part of the Y.M.C.A. building "in which its work of charity or benevolence [was] carried on" (187 A. 214) rather than focused on the use of such dormitory facilities as a reasonably necessary and integrated factor in furtherance of the declared corporate purposes of the association; and (3) the reliance placed on certain Missouri cases (State ex rel. St. Louis Young Men's Christian Ass'n v. Gehner (1928), 320 Mo. 1172 [11 S.W.2d 30]; St. Louis Y.M.C.A. v. Gehner (1932), 329 Mo. 1007 [47 S.W.2d 776, 81 A.L.R. 1449]) where under a constitutional provision exempting from taxation buildings "used exclusively for religious worship ... or for purposes purely charitable," dormitory accommodations provided in Y.M.C.A. buildings were held taxable because serving a commercial purpose rather than used exclusively for charitable purposes within the purport of the exemption (11 S.W.2d 37-38; 47 S.W.2d 778), a construction of the exempting language which has been expressly disapproved in later Missouri cases as too rigid in principle and inconsistent with the policy of the law. (Salvation Army v. Hoehn (1945), 354 Mo. 107 [188 S.W.2d 826, 830- 831]; Missouri Goodwill Industries v. Gruner (1948), supra, 357 Mo. 647 [210 S.W.2d 38, 40].)
 It is manifest from the record here that plaintiff's conduct of dormitory facilities at its respective branches correlates wholly with its purpose of providing for the welfare of young men and boys of moderate earning capacity and income, through the maintenance of lodging quarters at a minimum cost so that they may have a place of study, recreation and abode, under wholesome and decent influences and with proper protection and guidance designed to foster good citizenship and inculcate Christian ideals and character. Plaintiff's method of operating the dormitory sections of its buildings indicates the close interrelation between dormitory residence and plaintiff's basic purpose to furnish clean and elevated surroundings for young men and boys--and a lapse from the prescribed standards constitutes cause for expulsion. Such *770 circumstances effectively serve to distinguish plaintiff's dormitory operations from a commercial hotel enterprise and indicate them to be properly classifiable in the light of plaintiff's practical charity work through serving the public welfare--in a sense dovetailing with and rounding out plaintiff's fundamental religious and charitable purposes. As so analyzed, the fact that plaintiff's dormitories, as a secondary consideration also serve the residential purposes of the occupants does not destroy the effect of their dominant purpose as property "used exclusively for religious ... or charitable purposes" within the contemplation of the welfare tax exemption law.
 Similar considerations prevailed in opinions this day filed with regard to the tax exempt status of a nurses' home operated as a necessary adjunct of a hospital (Cedars of Lebanon Hospital v. County of Los Angeles, L. A. No. 20610, ante, p. 729 [221 P.2d 31]) and the lodgings of priests in effectuating the operation of a religious retreat house (Serra Retreat v. County of Los Angeles, L. A. No. 20612, ante, p. 755 [221 P.2d 59]). Like reasoning has been applied in other jurisdictions where the exemption of dormitory facilities maintained by Y.M.C.A. and similarly organized institutions has been sought under substantially the same tax exempting language as is here involved (Y.M.C.A. of Lincoln v. Lancaster County (1921), supra, 106 Neb. 105 [182 N.W. 593, 34 A.L.R. 1060]; In re Syracuse Y.M.C.A. (1925), 126 Misc. 431 [213 N.Y.S. 35]; Young Women's Christian Ass'n v. Baumann (1939), 344 Mo. 898 [130 S.W.2d 499]; Salvation Army v. Hoehn (1945), supra, 354 Mo. 107 [188 S.W.2d 826]), and the Germantown Y.M.C.A. case on which defendants mainly rely is distinguishable not only on the basis of the precise exempting language there involved as above noted, but also as contrary to the modern trend of authority.
 Defendants further argue that since plaintiff rents the dormitory rooms at its respective branches, their tax exemption would run counter to the statutory provision that the property in question "not [be] used or operated by the owner ... for profit regardless of the purposes to which the profit is devoted." (Rev. & Tax. Code, 214, subd. (3).) However, such contention misconstrues the purport of the stated prohibition. It is true that plaintiff requires its dormitory residents to pay a moderate rental for the rooms in keeping with the modest scale of furnishings, and so realizes income which is used to defray operating expenses. But under the stipulated *771 facts, it does not appear that there was any real profit motive in such undertaking as integrated into plaintiff's recognized religious and charitable objectives. The housing accommodations are rendered at a minimum charge and while plaintiff's method of bookkeeping only classifies receipts and expenditures as total items in relation to all operations at the respective branches, without breakdown or allocation among any of the particular activities or facilities as provided, it is apparent from plaintiff's accounting records that at each branch the amount of revenue derived from its functions is substantially less than the sum of expenditures, with the difference met by voluntary contributions and a Community Chest allowance. That such operating deficit prevails with respect to the domitory portions as a segregable department in plaintiff's buildings cannot be disputed when it is remembered that at some of plaintiff's branches, as above noted, these facilities constitute the only additional service feature offered and while, wherever furnished, they are a main source of revenue, nevertheless the branch as a whole carries on its work at a net financial loss. Moreover, a further factor affecting the balance of plaintiff's receipts against its expenses in regard to its domitory facilities is plaintiff's frequent practice of furnishing housing accommodations to young men who apply for lodging though they are without funds to pay even a moderate rental therefor, and arrangements for their limited stay are made on a loan basis. Often the loans are not repaid, and to that extent plaintiff suffers an additional financial loss.
 Furthermore, the mere fact that the exempt institution may have income or earnings from its property is not necessarily decisive in determining the tax status of its property or any portion thereof. Both the constitutional provision and the statute contemplate that the exempt institution may have income and even "net earnings" without losing the benefit of its exemption, provided such earnings are derived from the normal pursuit of its exempt purposes and provided further that all other conditions, enumerated in section 214 of the Revenue and Taxation Code, are met. Therefore, income derived by plaintiff here from dormitories maintained for its members in the normal pursuit of its exempt purposes, that is to say, from a facility which is incidental to and reasonably necessary for the accomplishment of its exempt purposes, is to be distinguished from income derived from a facility which is not so correlated with its exempt purposes. It is income in the latter sense that the welfare exemption condition, reasonably *772 construed, should be held to cover in its reference to the receipt of "profit" as precluding property so used from attaining a tax exempt status even though such "profit" be exclusively devoted to the exempt purposes. Analogous considerations illustrating this distinction prevailed in the case of San Gabriel Cemetery Ass'n v. County of Los Angeles (1942), 49 Cal.App.2d 624 [122 P.2d 330], where in analyzing the purport of article XIII, section 1b of the state Constitution, exempting from taxation "property used or held exclusively for" burial purposes and "no part thereof ... used or held for profit," the "financial benefit that accrue[d] to the association through the sales of burial space at a price in excess of its cost when such gain [was] used for the upkeep of the cemetery property" was not deemed to involve the receipt of "profit" so as to defeat the tax exempt character of the association's cemetery property. (P. 626.) Accordingly, the court distinguished such situation from that existing in the case of Cypress Lawn Cemetery Ass'n v. San Francisco (1931), 211 Cal. 387 [295 P. 813], where the association's devotion of "the entire income derived from [its operation of a] hotel ... to the care and maintenance of" its cemetery (p. 390)--income received from a differing use of property than that prescribed by the constitutional provision--was held "not [to] work an exemption of the hotel proper" (p. 391). To like effect see opinion this day filed in the consolidated hospital cases, Cedars of Lebanon Hospital v. County of Los Angeles, L. A. No. 20610, ante, p. 729 [221 P.2d 31], with reference to the operation of a "thrift shop" on premises of one of the hospitals, and the use of the income therefrom "for hospital ... or charitable purposes"; also see Y.M.C.A. of Lincoln v. Lancaster County (1921), supra, 106 Neb. 105 [182 N.W. 593, 596, 34 A.L.R. 1060]; Young Women's Christian Ass'n v. Baumann (1939), supra, 344 Mo. 898 [130 S.W.2d 499, 502]. In line with the views hereinabove expressed, plaintiff is entitled to the benefit of the welfare exemption law with respect to the portions of its respective branches used as dormitory accommodations.
 [3] There now remains for consideration the other disputed facilities furnished by plaintiff at specific branches and claimed to meet the basic requirement of "property used exclusively for religious ... or charitable purposes" within the meaning of the welfare exemption law: (1) At the San Pedro Branch, the restaurant operated by Y.M.C.A. employees but open to the public as well as to plaintiff's members, resident *773 and nonresident, and serving meals at standard charges prevailing in the community; Cluverius Hall, the meeting room where outside groups up to a maximum of 100 may be served meals; the barber shop leased to outside parties at a rental of $10 per week, and the valet shop operated by Y.M.C.A. employees on a gross receipt percentage basis, both shops open to the public and with charges at regular commercial rates; and the "gym store," which at the time here pertinent had expanded its stock of merchandise to include toilet articles, trinkets, curios, and like items over and above its regular line of athletic equipment and clothing, and was open to the public as well as to Y.M.C.A. members; (2) at the Downtown Branch, the barber and valet shops--here the former operated by Y.M.C.A. employees on a gross receipt percentage basis and the latter leased to outside parties at a rental of $100 per month--both shops open to the public and charges for the respective services made at commercial rates; and (3) at the East Los Angeles Branch, the office space rented to the Selective Service Board at a rental of $100 per month.
 With reference to these facilities as located at the mentioned branches, plaintiff takes the position that they not only function primarily as additional services for the benefit of its dormitory residents, but they materially assist plaintiff in making its entire plan attractive to young men as well as promote public interest and awareness of plaintiff's general activities, thereby strengthening and extending plaintiff's moral and uplifting influences in the community. Relative to the restaurant, plaintiff argues that the meal service not only accommodates the dormitory residents, their relatives and friends, but likewise brings to this particular branch such members of the public as choose to come so that it functions as a community service--an added facility which, if established at other branches, would redound to their great advantage in the carrying out of the general program; that consistent with its performance of practical charitable work, credit for meals is extended to needy individuals, who sometimes fail to repay the amount of their obligation in this regard; that outside groups are encouraged to meet at plaintiff's branch and participate in its recreational program if there is a place where such groups can get together at mealtime; and that plaintiff has refused to lease the restaurant facility because it wanted to keep control of its operation and maintain the meal service on the same price level in harmony with its basic purposes. *774 In regard to Cluverius Hall, plaintiff notes that it is the only place in the community of San Pedro where there are facilities suitable for serving meals to civic organization groups at a reasonable cost and, as such, it constitutes a public service and is valuable in promoting favorable public relations. As to the tailor and barber shop services, plaintiff maintains that they are provided primarily as an incident to the dormitory facilities--accommodating in the main the dormitory residents, to a considerably lesser extent plaintiff's nonresident members, and only a relatively small portion of the general public; that the public is allowed to avail itself of these particular services only because the demands therefor on the part of plaintiff's members, resident and nonresident, are not sufficient to require their full- time use. In relation to the expanded inventory of the "gym store" as precluding its tax exempt status, plaintiff calls attention to the fact that such condition was only temporary to meet a wartime need on the part of members of the Armed Forces visiting the San Pedro Branch and whom plaintiff particularly wished to accommodate as part of its basic objectives in serving young men; that the added items of merchandise have been discontinued as the need therefor disappeared, and the "gym store" in question has returned to the uniform policy prevailing with respect to other gym stores operated by plaintiff, limited to the sale of athletic equipment and clothing for use in the sports and recreational activities pursued at the various branches. And finally with regard to the office rooms rented to the Selective Service Board, plaintiff emphasizes that such arrangement was temporary and "somewhat involuntary" in that the accommodation was extended to the draft board upon request and following its eviction from certain office space previously occupied in a public school building; that such use of its property, having to do with young men, "had a rather accidental relationship to the basic activities of the Y.M.C.A."; that in any event it was discontinued as of December, 1946, and in the absence of these "special circumstances," "exemption could not be allowed as to this item."
 But conceding the praiseworthy motives underlying the establishment of these respective facilities as outlined by plaintiff, it must be remembered that the test for the welfare exemption is not the number of good purposes to which plaintiff's property may be put nor the amount of benefit that may be derived therefrom by plaintiff's members as well as the general public, but whether the property may reasonably be *775 regarded as "exclusively used" for exempt purposes. Under the agreed facts here, the conclusion is inescapable that the restaurant, as well as the tailor and barber shops, all available to the public as well as to plaintiff's members, and charging standard prices for their respective services in competition with like enterprises maintained in the community, are largely commercial in character and properly classifiable as business ventures. That the money derived therefrom may be used exclusively for plaintiff's operational upkeep as a charitable organization (Cypress Lawn Cemetery Ass'n v. San Francisco (1931), supra, 211 Cal. 387, 390) or that such facilities may be desirable in the promotion of plaintiff's general service plan does not alter the fact that they involve the use of portions of plaintiff's property for facilities which are not merely incidental to and reasonably necessary for the accomplishment of exempt purposes. (Y.M.C.A. of Lincoln v. Lancaster County (1921), supra, 106 Neb. 105 [182 N.W. 593, 596, 34 A.L.R. 1060].) It is true, as plaintiff contends, that in the last cited case the restaurant facility maintained on the Y.M.C.A. property and held to constitute "a commercial enterprise" so as not to be tax exempt, was rented to outside parties rather than operated by Y.M.C.A. employees as is the situation here. Nevertheless the absence of such consideration alone does not establish the propriety of plaintiff's exemption claim on this particular facility in view of its service of the general public and the basic competitive nature of its operation in relation to similar business in the community that is taxable. (Y.W.C.A. v. City of New York (1926), 217 App.Div. 406 [216 N.Y.S. 248, 252-253].) The restaurant as here conducted is in nowise integrated into any educational or training program on the part of plaintiff in the sense that its members prepared the meals incident to the learning of the art of cooking as a gainful occupation, such as was a material consideration in the case of Young Women's Christian Ass'n v. Baumann, supra, 344 Mo. 898 [130 S.W.2d 499, 502], for the exemption of the cafeteria there involved.
 The same essential competitive, commercial features prevail with respect to plaintiff's tailor and barber shops, whether rented to outside parties or operated by its employees, so as to deprive these facilities of a tax exempt status. The fact that the restaurant and the shops may be maintained at a net financial loss or serve primarily plaintiff's own members does not determine their tax exempt status, for use of the property is the criterion of the welfare exemption law, not *776 its self-sustaining ability or the precise extent of its service to the public at large. Likewise commercial in aspect was the expanded "gym store," with a competitive line of merchandise extending beyond the requirements of plaintiff's athletic and recreational facilities. While such expanded inventory was temporary, so long as such store continued to serve the general public, the portion of the property occupied by it was not entitled to an exempt status. And finally, consistent with the recognized rule that property of such an institution as the Y.M.C.A. or Y.W.C.A. "leased or rented for business purposes is generally held not exempt from taxation" under such exemption law as is here involved, "although the proceeds derived in [that] manner are applied to the purposes of the organization" (51 Am.Jur. 642, p. 611; 34 A.L.R. 1072; 81 A.L.R. 1457), the rented office space to the Selective Service Board cannot be held tax exempt.
 [4] Turning now to plaintiff's claim to the benefits of the welfare exemption law in relation to the flood control district assessments, plaintiff cannot prevail in view of the limited scope of the law to exemption from "taxation" and the distinguishable nature of an assessment levy as fully discussed in the opinion this day filed in the consolidated hospital cases, Cedars of Lebanon Hospital v. County of Los Angeles, L. A. No. 20610, ante, p. 729 [221 P.2d 31], to which reference is hereby made in disposition of this issue between the parties.
 The judgment is reversed and the cause remanded, with instructions to the trial court to proceed in accordance with the views hereinabove expressed. The parties will bear their own costs on this appeal.
 Gibson, C.J., Edmonds, J., Carter, J., and Traynor, J., concurred.
 SCHAUER, J.
 I concur in the judgment. I am in accord with the conclusions of the majority as to the nonexempt character of the shops, restaurants and property leased to the government agency, and as to the inapplicability of the welfare exemption to the flood control assessments.
 As to the holding that the dormitory property is exempt from taxation, I concur solely on the ground that it is apparent from the agreed statement of facts that no portion of such property was consistently and intentionally operated so as to produce a profit. As stated by the majority (p. 771), *777 "That ... [an] operating deficit prevails with respect to the dormitory portions as a segregable department in plaintiff's buildings cannot be disputed when it is remembered that at some of plaintiff's branches ... these facilities constitute the only additional service feature offered and while, wherever furnished, they are a main source of revenue, nevertheless the branch as a whole carries on its work at a net financial loss."
 If a portion of the dormitory property were operated under a policy of charging more rent than the cost of furnishing shelter, then in my view such property would not be tax exempt even though the profits were devoted to defray the expense of operating other dormitory property at a loss. To hold otherwise would not seem to me to give to the tax exemption statute a "strict but reasonable" construction; rather, with excessive liberality to the selected taxpayer, such holding would effectively delete from the statute the clause, "regardless of the purposes to which the profit is devoted." As I understand the majority opinion, it would permit such a holding. For example, the majority say (pp. 771-2), "income derived by plaintiff here from dormitories maintained for its members in the normal pursuit of its exempt purposes, that is to say, from a facility which is incidental to and reasonably necessary for the accomplishment of its exempt purposes, is to be distinguished from income derived from a facility which is not so correlated with its exempt purposes. It is income in the latter sense that the welfare exemption condition, reasonably construed, should be held to cover in its reference to the receipt of 'profit' as precluding property so used from attaining a tax exempt status even though such 'profit' be exclusively devoted to the exempt purposes."
 The case of San Gabriel Cemetery Assn. v. County of Los Angeles (1942), 49 Cal.App.2d 624 [122 P.2d 330], here relied upon by the majority (p. 772) but distinguished by them in Cedars of Lebanon Hospital v. County of Los Angeles, ante, p. 729 [221 P.2d 31], was concerned with the meaning of the phrase "used or held for profit" in section 1b of article XIII of the California Constitution, which exempts "all property used or held exclusively for the burial or other permanent deposit of the human dead or for the care, maintenance or upkeep of such property or such dead, except as used or held for profit." There, cemetery lots were sold at more than cost, but the excess proceeds were used for upkeep, advertising and the purchase of more lots. It was held that such use of the lots and the proceeds of sale was within *778 the use permitted by the exemption clause of the Constitution. In my view the clause "regardless of the purposes to which the profit is devoted" was placed in section 214 of the Revenue and Taxation Code to prevent a similar construction where, for example, hospital beds are operated at more than cost and the proceeds are devoted to hospital uses. Hence, the cited case neither requires nor permits a construction of the present exemption statute which would exempt dormitory property operated for profit even if such profit is used to defray the expense of operating other dormitory property at a loss.
 SHENK, J.,
 Concurring and Dissenting.
 I concur in the opinion and judgment insofar as it holds that the dormitories in question are tax exempt and that all of the properties are taxable under the Los Angeles County Flood Control District Act. But I do not agree that the other properties are not exempt from the general tax. My dissent in the main is based on the views expressed in my concurring and dissenting opinion in Cedars of Lebanon Hospital v. County of Los Angeles (ante, p. 729 [221 P.2d 31]).
 The conclusions of nonexemption are said to result from the partially commercial nature of the restaurant, Cluverius Hall, barber and valet shops, a small merchandising department featuring gymnasium supplies (in that respect concededly exempt) but temporarily selling trinkets to army men, and a space temporarily used by the Selective Service Board during wartime activities at a nominal rental. It is declared that adherence to legal principle does not require that the narrowest possible meaning be given to the exempting language if it would establish too severe a standard and defeat the apparent object of the law. In my opinion the result in this case does what the statement purportedly attempts to avoid. None of the properties was held as investment property with profit-making as the objective. As in the case of the dormitories, so in the conduct of the other services, there does not appear to be, as said in the opinion, "any real profit motive in such undertaking as integrated into plaintiff's recognized religious and charitable objective." The facts alleged in connection with these, as with other activities, show that there is no profit, and that deficits are met by voluntary contributions and Community Chest allowances. No contention is made that if the various services were available solely to "Y" members the property would be taxable. But the policy of the "Y" to make its influence as far-reaching as possible renders it impractical *779 to close the doors of its departments to the public generally. So long as the basic conception of need to its members is present, in the absence of any real profit motive, the fact of incidental availability to the public should not be held to convert the service into a commercial venture and thus beyond the application of the exempting language. These services were "integrated" with the exempt purposes, and the property should likewise be held to be exempt. As indicated in my opinion in the Cedars of Lebanon case, the integration with the exempt purposes distinguishes the facts from Cypress Lawn Cemetery Ass'n v. San Francisco, 211 Cal. 387 [295 P. 813], where the cemetery association conducted a hotel for profit, which was a use clearly dissociated from the exempt cemetery purpose.
 The space rented to the selective draft board should likewise be deemed exempt for the reason that this temporary use of the property otherwise devoted to religious and charitable purposes was in essence a governmental "command performance," without any profit motive, and it does not appear from the facts alleged that a profit was derived by virtue of the nominal rental received.
 The arguments presented by the plaintiff and outlined in the majority opinion serve to support a conclusion that all of the properties here involved were used exclusively for religious and charitable purposes.