[S. F. No. 19026. In Bank. June 6, 1956.]

ALFRED J. LUNDBERG, Respondent, v. COUNTY OF ALAMEDA et al., Defendants and Appellants; THE ROMAN CATHOLIC WELFARE CORPORATION OF SAN FRANCISCO (a Corporation), Intervener and Appellant.*

*Reporter's Note: Respondent Lundberg died after filing of this decision and Paul W. Hersey as Special Administrator was substituted in his place.

J. F. Coakley, District Attorney, R. Robert Hunter, Chief Assistant District Attorney, Richard J. Moore and Maury Engel, Deputy District Attorneys, John W. Collier, City Attorney (Oakland), Robert E. Nisbet, Deputy City Attorney, Edmund G. Brown, Attorney General, and Clarence A. Linn, Chief Assistant Attorney General, for Defendants and Appellants.

Andrew F. Burke for Intervener and Appellant.

Hill, Farrer & Burrill, Anson B. Jackson, Jr., Musick, Peeler & Garrett and James E. Ludlam as Amici Curiae on behalf of Defendants and Appellants and Intervener and Appellant.

Henry C. Clausen for Respondent.

Culbert L. Olson as Amicus Curiae on behalf of Respondent.

GIBSON, C. J.—Plaintiff, a citizen resident of defendant county and a taxpayer therein, brought this suit to challenge the legality of a tax exemption. Such actions are authorized by section 526a of the Code of Civil Procedure,[1] (*cf. Delaney* v. *Lowery*, 25 Cal.2d 561 [154 P.2d 674]) and, being in aid of the collection of taxes, are distinguishable from cases in which a party seeking to avoid taxation was denied mandamus on the ground that an action for refund of illegally collected taxes constituted an adequate remedy at law. (See *Security-First Nat. Bank* v. *Board of Supervisors*, 35 Cal.2d 323 [217 P.2d 948]; *Vista Irr. Dist.* v. *Board of Supervisors*, 32 Cal.2d 477 [196 P.2d 926]; *Sherman* v. *Quinn*, 31 Cal.2d 661 [192 P.2d 17].)

The suit involves the constitutionality of that portion of section 214 of the Revenue and Taxation Code[2] which grants

---

[1]Section 526a of the Code of Civil Procedure provides: "An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of or injury to, the estate, funds, or other property of a county, town, city or city and county of the state, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a citizen resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax therein. This section does not affect any right of action in favor of a county, city, town, or city and county, or any public officer; provided, that no injunction shall be granted restraining the offering for sale, sale, or issuance of any municipal bonds for public improvements or public utilities."

[2]Section 214 of the Revenue and Taxation Code provides:

"Property used exclusively for religious, hospital, scientific, or charitable purposes owned and operated by community chests, funds, foundations or corporations organized and operated for religious, hospital, scientific, or charitable purposes is exempt from taxation if:

"(1) The owner is not organized or operated for profit; provided, that in the case of hospitals, such organization shall not be deemed to be organized or operated for profit, if during the immediate preceding fiscal year the excess of operating revenues, exclusive of gifts, endowments and grants-in-aid, over operating expenses shall not have exceeded a sum equivalent to 10 percent of such operating expenses. As used herein, operating expenses shall include depreciation based on cost of replacement and amortization of, and interest on, indebtedness;

"(2) No part of the net earnings of the owner inures to the benefit of any private shareholder or individual;

"(3) The property is used for the actual operation of the exempt activity;

"(4) The property is not used or operated by the owner or by any other person so as to benefit any officer, trustee, director, shareholder,

a tax exemption to property "used exclusively for school purposes of less than collegiate grade and owned and operated by religious, hospital or charitable funds, foundations or corporations," provided that the property is used for non-profit purposes and owned by nonprofit organizations. The exemption in question was added to section 214 in 1951 and was approved by the people on referendum at the general election of 1952. This appeal was taken from a judgment declaring the exemption invalid.

■ In California all property must be taxed unless an exemption is authorized by the state Constitution or granted by the laws of the United States. Section 1c of article XIII of the Constitution declares, "In addition to such exemptions as are now provided in this Constitution, the Legislature may exempt from taxation all or any portion of property used exclusively for religious, hospital or charitable purposes and owned by community chests, funds, foundations or corporations organized and operated for religious, hospital or charitable purposes, not conducted for profit and no part of

---

member, employee, contributor, or bondholder of the owner or operator, or any other person, through the distribution of profits, payment of excessive charges or compensations or the more advantageous pursuit of their business or profession;

"(5) The property is not used by the owner or members thereof for fraternal or lodge purposes, or for social club purposes except where such use is clearly incidental to a primary religious, hospital, scientific, or charitable purpose;

"(6) The property is irrevocably dedicated to religious, charitable, scientific, or hospital purposes and upon the liquidation, dissolution or abandonment of the owner will not inure to the benefit of any private person except a fund, foundation or corporation organized and operated for religious, hospital, scientific, or charitable purposes;

"(7) The property, if used exclusively for scientific purposes, is used by a foundation or institution which, in addition to complying with the foregoing requirements for the exemption of charitable organizations in general, has been chartered by the Congress of the United States (except that this requirement shall not apply when the scientific purposes are medical research), and whose objects are the encouragement or conduct of scientific investigation, research and discovery for the benefit of the community at large.

"The exemption provided for herein shall be known as the 'welfare exemption.' This exemption shall be in addition to any other exemption now provided by law. This section shall not be construed to enlarge the college exemption. Property used exclusively for school purposes of less than collegiate grade and owned and operated by religious, hospital or charitable funds, foundations or corporations, which property and funds, foundations or corporations meet all of the requirements of this section, shall be deemed to be within the exemption provided for in Section 1c of Article XIII of the Constitution of the State of California and this section."

the net earnings of which inures to the benefit of any private shareholder or individual."[3]

■ The validity of the statutory exemption depends, first, upon whether an educational purpose may be regarded as a charitable purpose within the meaning of section 1c of article XIII. The term charity has been defined in a number of California cases as "a gift to be applied consistently with existing laws, for the benefit of an indefinite number of persons—either by bringing their hearts under the influence of education, or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government." (*Estate of Halm,* 196 Cal. 778, 781-782 [239 P. 307]; *Estate of Coleman,* 167 Cal. 212, 214 [138 P. 992, Ann.Cas. 1915C 682]; *Estate of Sutro,* 155 Cal. 727, 736 [102 P. 920]; *Estate of Lennon,* 152 Cal. 327, 329-330 [92 P. 870, 125 Am.St.Rep. 58, 14 Ann.Cas. 1024]; *Estate of Merchant,* 143 Cal. 537, 543-544 [77 P. 475].) This definition was quoted with approval in *Scripps etc. Hospital* v. *California Emp. Com.,* 24 Cal.2d 669, 675 [151 P.2d 109, 155 A.L.R. 360], where a nonprofit hospital was held exempt from unemployment insurance taxes as a charitable organization.

■ An educational purpose has been held to be charitable in character where the status of a trust or bequest was in controversy and the gift was for the benefit of the public and not for private gain. (*Collier* v. *Lindley,* 203 Cal. 641, 648-650 [266 P. 526]; *Estate of Halm,* 196 Cal. 778, 781-782 [239 P. 307]; *Estate of Yule,* 57 Cal.App.2d 652, 654 [135 P.2d 386]; *Estate of Bailey,* 19 Cal.App.2d 135, 139 [65 P.2d 102]; *Estate of Bartlett,* 122 Cal.App. 375, 377 [10 P.2d 126]; see Rest., Trusts, § 370; 14 C.J.S. 444.) And in other jurisdictions it has been held that nonprofit educational institutions maintained for the benefit of the public qualify as charitable organizations for the purpose of tax exemption. (*School of Domestic Arts & Science* v. *Carr,* 322 Ill. 562 [153 N.E. 669]; *Appeal Tax Court* v. *St. Peter's Academy,*

[3]Section 1c, as adopted in 1944, read as quoted above. The following was added by amendment in 1954: "As used in this section, 'property used exclusively for religious, hospital or charitable purposes' shall include a building and its equipment in the course of construction on or after the first Monday of March, 1954, together with the land on which it is located as may be required for the use and occupation of the building, to be used exclusively for religious, hospital or charitable purposes."

50 Md. 321; *Board of Assessors* v. *Garland School of Home Making*, 296 Mass. 378 [6 N.E.2d 374]; *State* v. *Johnston*, 65 N.J.L. 169 [46 A. 776]; *Gerke* v. *Purcell*, 25 Ohio St. 229; *In re Hill School*, 370 Pa. 21 [87 A.2d 259]; see *In re Cooper's Estate*, 229 Iowa 921 [295 N.W. 448]; *Morgan* v. *Presbyterian Church of the United States of America*, 31 Ky.L.R. 38 [101 S.W. 338]; *In re Grace*, 27 Minn. 502 [8 N.W. 761].)

The argument made by plaintiff that the word charitable should be narrowly construed in favor of taxability has been rejected by this court in two recent cases involving section 1c of article XIII. (*Young Men's Christian Assn.* v. *County of Los Angeles*, 35 Cal.2d 760 [221 P.2d 47]; *Fredericka Home for Aged* v. *County of San Diego*, 35 Cal.2d 789 [221 P.2d 68].) In the Y.M.C.A. case, where it appeared that the Association operated at an over-all loss in conducting its various activities, we held that dormitory facilities provided by it at relatively low rentals were exempt as property used exclusively for religious and charitable purposes, pointing out that the dormitories were designed mainly to give young men access to a place for study, recreation and residence under wholesome influences and that, therefore, they were incidental to and reasonably necessary for the accomplishment of the organization's purposes of promoting good character and Christian ideals. We refused to follow a contrary holding in another jurisdiction, noting that one of the factors leading to that decision was a ''concept of charity as confined solely to the relief of the needy and destitute . . . rather than comprehending as well activities which are humanitarian in nature and rendered for the general improvement and betterment of mankind, though the recipients of such benefits may be able to pay at least in part therefor. . . .'' (35 Cal.2d at p. 768.)

The broad meaning of the term charitable set forth in the Y.M.C.A. case was applied in the Fredericka Home case where it was held that a home for the aged, operated on a nonprofit basis, was entitled to tax exemption as a charity although entrance fees were charged. Both of these decisions relied upon *Estate of Henderson*, 17 Cal.2d 853, 857 [112 P.2d 605], where it was stated, ''A bequest is charitable if: (1) It is made for a charitable purpose; its aims and accomplishments are of religious, educational, political or general social interest to mankind. . . . (2) The ultimate recipients constitute either the community as a whole or an unascertainable and indefinite portion thereof. . . . The char-

itable nature of an institution is determined on the same basis.''

The fact that the term charitable is only one of three descriptive words used in section 1c does not require that it be narrowly construed against the exemption. To the contrary, in *Scripps etc. Hospital* v. *California Emp. Com.*, 24 Cal.2d 669 [151 P.2d 109, 155 A.L.R. 360], where an unemployment insurance tax statute exempted organizations formed for purposes such as ''religious, charitable, scientific, literary or educational,'' it was held that a nonprofit hospital was exempt as a charity although the word hospital was not used in the statute. The court stated, ''The wide and varied nature of the exemption thus provided rather clearly indicates a purpose and intention to give the words here in question a broad rather than a strict meaning. . . .'' (24 Cal.2d at p. 676.)

It thus appears that the word charitable has been given a broad construction in tax exemption cases as well as others, and it would seem clear that nonprofit schools owned by nonprofit organizations and operated for the benefit of the public come within the term charitable as defined by our decisions. Moreover, both the Legislature and the people have construed the term charitable in section 1c of article XIII as authorizing exemption of such schools.

Section 1c is an enabling provision which empowers the Legislature to grant exemptions within certain general categories. In acting under this section the Legislature must necessarily construe the terms of the provision in order to determine the extent of the authority conferred upon it. The Legislature has consistently treated the term charitable in section 1c as broad enough to include nonprofit schools, first, by specifically excluding them from exemption and, second, by specifically granting them an exemption. The first construction was made in 1945 when the Legislature originally enacted section 214 of the Revenue and Taxation Code, which provided for the exemption of property used exclusively for charitable purposes. The Legislature must have then believed that the word charitable as used in section 1c authorized the exemption of nonprofit schools, and that the unqualified use of that term in section 214 would result in exempting such schools, because it added at the end of section 214 a proviso that the section should not be construed to include

them.[4] If the word charitable was not broad enough to include nonprofit schools, there would have been no necessity for the proviso, and we cannot assume that the Legislature intended to do a useless thing. The next interpretation of section 1c occurred in 1951 when the Legislature amended section 214 to provide for the exemption of nonprofit schools as charitable organizations. The construction thus placed on section 1c by the Legislature was adopted by the people in 1952 when they approved section 214 on referendum.[5]

The presumption is in favor of constitutionality, and the invalidity of an act of the Legislature must be clear and unquestionable before the statute can be declared uncon- We cannot adopt our own interpretation of a provision of the Constitution without regard to the legislative construction, and, where more than one reasonable meaning exists, it is our duty to accept that chosen by the Legislature. (*Pacific Indem. Co.* v. *Industrial Acc. Com.*, 215 Cal. 461, 464 [11 P.2d 1, 82 A.L.R. 1170]; *Kaiser* v. *Hopkins,* 6 Cal.2d 537, 540 [58 P.2d 1278]; *San Francisco* v. *Industrial Acc. Com.*, 183 Cal. 273, 279 et seq. [191 P. 26]; *People* v. *Southern Pac. Co.*, 209 Cal. 578, 593-594 [290 P. 25]; see also *Woodcock* v. *Dick,* 36 Cal.2d 146, 148 [222 P.2d 667]; *Reynolds* v. *State Board of Equalization,* 29 Cal.2d 137, 140 [173 P.2d 551, 174 P.2d 4]; *Delaney* v. *Lowery,* 25 Cal.2d 561, 568-569 [154 P.2d 674].) This fundamental principle is particularly applicable where, as here, the statute was enacted pursuant to an enabling provision of the Constitution and there is not only a reasonable legislative construction of that provision but also approval of that construction by the people on referendum.

Plaintiff relies strongly upon the legislative history of section 1c in support of his claim that section 214 is unconstitutional. As originally submitted to the Legislature section 1c read, ''The Legislature may exempt from taxation all or any portion of the property owned and used for any of the purposes hereinafter mentioned by community chests,

---

[4]As enacted in 1945 section 214 of the Revenue and Taxation Code provided, in part, ''This section shall not be construed to enlarge the college exemption or to extend an exemption to property held by or used as an educational institution of less than collegiate grade.'' (Stats. 1945, ch. 241, p. 706.)

[5]Section 214, as submitted to the people, specified that the property therein described ''shall be deemed to be within the exemption provided for in Section 1c of article XIII of the Constitution. . . .''

funds, foundations or corporations organized and operated for religious, educational, hospital or charitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual." The measure was entirely recast, and in its final form the word educational was omitted, but there is nothing in the record to show why the provision was revised. As we have seen, nonprofit schools owned by nonprofit organizations and operated for the benefit of the public come within the term charitable, and the Legislature may have omitted the word educational on the theory that, under the authorities here and elsewhere, it was unnecessary to use that specific word in order to authorize the exemption of such schools. In the official voters' pamphlet the argument in favor of adoption of section 1c contained the statement, "Competent legal authority advises that schools other than colleges will not be exempted under this amendment because the Legislature expressly eliminated the term 'educational.' " Numerous other arguments were made, however, for and against adoption, and we cannot say which of the various statements was relied on by the voters. It would be purely speculative to hold that those who voted for the amendment intended to exclude nonprofit schools owned by nonprofit organizations and operated for the benefit of the public. The history of section 1c is inconclusive as to what was intended, and it certainly would not justify a construction of the term charitable contrary to that established by the decisions discussed above, adopted by the Legislature in the 1945 and 1951 sessions, and approved by the people on referendum in 1952. We are satisfied that section 1c authorizes the exemption in question.

 It is next argued that the exemption, as applied to schools owned or operated by religious organizations, is contrary to section 30 of article IV of the California Constitution which provides that the Legislature shall not "grant anything to or in aid of any religious sect, church, creed, or sectarian purpose, or help to support or sustain any school, college, university, hospital, or other institution controlled by any religious creed, church, or sectarian denomination whatever. . . ." This section does not expressly mention tax exemptions, but, even if we assume that it prohibited them, it was superseded by the subsequent adoption of section $1\frac{1}{2}$ of article XIII, which exempts property used exclusively for religious worship, and of section 1c, which, as we have seen,

authorizes exemption of nonprofit schools and specifically refers to property owned and operated by religious organizations.

The validity of the exemption is also challenged on the theory that it contravenes that portion of the First Amendment of the federal Constitution which forbids the enactment of laws respecting the establishment of religion. This argument is, of course, pertinent only insofar as the exemption would be available to nonprofit schools operated by religious groups. There are two answers to the contention.

In the first place, it is apparent that the exemption was enacted to promote the general welfare through encouraging the education of the young and not to favor religion, since it is not limited to schools maintained by religious groups but applies also to those operated by other charitable organizations. Under the circumstances, any benefit received by religious denominations is merely incidental to the achievement of a public purpose. An analogous situation was presented in *Everson* v. *Board of Education,* 330 U.S. 1 [67 S.Ct. 504, 91 L.Ed. 711, 168 A.L.R. 1392], where it was held that a statute authorizing the use of public funds to transport pupils could constitutionally be applied to include the furnishing of transportation to parochial schools. The court reasoned that the statute was designed to promote the general welfare, that a parochial school would benefit upon the same terms as would other schools and that the First Amendment does not require that government be hostile to religion in enacting public welfare legislation. (330 U.S. at p. 16 et seq. *Cf. Bowker* v. *Baker,* 73 Cal.App.2d 653, 663 [167 P.2d 256]; *Opinion of the Justices,* 99 N.H. 519 [113 A.2d 114, 116].)

Secondly, even if we regard the exemption as benefiting religious organizations, it does not follow that it violates the First Amendment. The practice of granting tax exemptions benefiting religious sects began in the colonial period. (See Paulsen, *Preferment of Religious Institutions in Tax and Labor Legislation* (1949), 14 Law & Contemp. Prob. 144, 147-148; Torpey, *Judicial Doctrines of Religious Rights in America* (1948), ch. VI, pp. 171-174; Zollman, *Tax Exemptions of American Church Property* (1916), 14 Mich.L.Rev. 646, 647-650.) Today, at least some tax exemption for religious groups is authorized by statutory or constitutional provisions in every state and the District of Columbia, as well as by federal law. (See note (1949) 49 Columb.L.Rev.

968, 969-982.) No case has been found holding that the granting of such exemptions is contrary to state or federal constitutional provisions prohibiting the support or establishment of religion, and, where the matter has been raised, the exemptions have been upheld. (*Garrett Biblical Institute* v. *Elmhurst State Bank,* 331 Ill. 308 [163 N.E. 1, 5] ; *Trustees of Griswold College* v. *State of Iowa,* 46 Iowa 275, 282 [26 Am.Rep. 138].) The United States Supreme Court, in discussing the prohibition of laws respecting the establishment of religion, recently stated that the standard of constitutionality is the separation of church and state, and that the problem, like many others in constitutional law, is one of degree. (*Zorach* v. *Clauson,* 343 U.S. 306, 314 [72 S.Ct. 679, 96 L.Ed. 954].) The principle of separation of church and state is not impaired by granting tax exemptions to religious groups generally, and it seems clear that the First Amendment was not intended to prohibit such exemptions. Accordingly, an exemption of property used for educational purposes may validly be applied to school property owned and operated by religious organizations.

The judgment is reversed. Certain other appeals were taken which have been rendered moot by this decision, and they are therefore dismissed.

Traynor, J., Spence, J., and McComb, J., concurred.

SCHAUER, J., Dissenting.—Since 1914 the provisions of section 1a of article XIII of the California Constitution have exempted from taxation the property of a nonprofit "*educational institution of collegiate grade,* . . . used exclusively for the purposes of education." (Italics added.) The quoted language is specific; it leaves no room for speculation or "construction." The majority opinion holds that the language in section 1c of the same article of the Constitution, adopted in 1944, which authorizes the Legislature to exempt from taxation property "used exclusively for *religious, hospital* or *charitable* purposes and owned by" (italics added) certain institutions, likewise authorizes the exemption of *all* the property of such institutions which is used for educational purposes of any character or grade—more specifically, property used for *schools of less than collegiate grade.* This holding is reached despite the fact that the word "educational" is notably absent from the 1944 amendment.

To so construe section 1c of article XIII as to encompass educational purposes, in addition to the "religious, hospital or charitable purposes" which are expressly designated in the section, does violence to the plain meaning of the language used, to the intent of the voters who adopted the section, and to settled principles of statutory construction.

First, the Constitution itself is specific in its property tax exemption provisions. Thus, section 1 of article XIII designates as "exempt from taxation . . . property used for free public libraries and free museums, growing crops, property used exclusively for public schools." Section 1a of article XIII declares that "Any educational institution of collegiate grade . . . not conducted for profit, shall hold exempt from taxation its buildings and equipment, its grounds . . ., its securities and income used exclusively for the purposes of education." Other specific exemptions are listed in article IX. Section 10 of that article declares that "All property now or hereafter held in trust for the founding, maintenance or benefit of the Leland Stanford Junior University . . . may be exempted by special act from State taxation . . . and all other real property so held and used by the university for educational purposes exclusively, may be similarly exempted from county and municipal taxation. . . ." Section 11 provides that "All property now or hereafter belonging to 'The California School of Mechanical Arts,' . . . shall be exempt from taxation." Section 12 makes the same provision as to "All property now or hereafter belonging to the 'California Academy of Sciences.' " Section 13 declares that "All property now or hereafter belonging to the Cogswell Polytechnical College . . . shall be exempt from taxation." Section 15 specifies that "All property as of July 1, 1929, held in trust for the founding, maintenance or benefit of the Henry E. Huntington Library and Art Gallery and the increments thereof and all personal property received in exchange therefor shall be exempt from taxation." In view of these unusually express and specific designations in the Constitution of the property to which the people are willing to grant tax exemption, it appears to me too clear for serious debate among jurists following the law that if by the provisions of section 1c of article XIII it was intended to grant exemption to property devoted to educational purposes, then the language used would have said so, clearly and precisely.

Second, the fact that as originally submitted to the Legislature section 1c referred to property used for "religious,

*educational,* hospital or charitable purposes'' (italics added), but that before being submitted to the people for a vote the classification of ''educational'' was deleted from the measure, is a further indication of the intent that property devoted to such purposes not be included in the authorization for exemption. This view is likewise borne out by the presentation of the measure made in the official voters' pamphlet, wherein the argument in favor of adopting section 1c refers to the amendment as ''FAIR PLAY FOR CHARITIES'' and declares, among other things, that ''To be exempted, property must be owned and used exclusively for the purposes stated. The amendment does not authorize exemption of investment property or large landholdings. Churches and colleges already are exempt. Competent legal authority advises that *schools other than colleges will not be exempted under this amendment because the Legislature expressly eliminated the term 'educational.' ''* (Italics added.) At no point in the arguments concerning the measure, either pro or con, are the above declarations disputed. It thus appears clear that the voters approved the measure in the belief that property used for educational purposes was not included in the authorized exemptions.

Moreover, the fate of other attempted amendments of the Constitution so as to specifically authorize the exemption of property used for private schools of less than collegiate grade expresses more pointedly than can mere words the affirmative intent of the voters of this state that such property continue on the tax rolls. In 1926 a proposed amendment to section 1a of article XIII, submitted as proposition Number 11 on the ballot, to extend the exemption to property used for educational purposes by ''any educational institution of secondary grade'' was defeated by the vote of the people. Within seven years the issue was again presented, as proposition Number 4 on the 1933 ballot, and again the people refused to amend section 1a so as to extend exemption to the property of ''Any private educational institution of less than collegiate grade.'' It is my firm conviction that this court should not, in the guise of statutory construction, effect an amendment of the Constitution which the voting citizens of California have repeatedly rejected.

Finally, the people of this state, for the purpose of securing the ''equality of taxation which results from subjecting all property to the same burden'' (*Watchtower Bible & Tract*

*Soc.* v. *County of Los Angeles* (1947), 30 Cal.2d 426, 429 [182 P.2d 178]), have provided in section 1 of article XIII of the Constitution that "All property in the State except as otherwise in this Constitution provided, not exempt under the laws of the United States, shall be taxed in proportion to its value, to be ascertained as provided by law, or as hereinafter provided." To carry out the objective of equality in taxation, "Constitutional provisions and statutes granting exemption from taxation are strictly construed to the end that such concession will be neither enlarged nor extended beyond the plain meaning of the language employed. [Citations.]" (*Cedars of Lebanon Hospital* v. *County of Los Angeles* (1950), 35 Cal.2d 729, 734 [221 P.2d 31, 15 A.L.R. 2d 1045]; see also *Pacific Home* v. *County of Los Angeles* (1953), 41 Cal.2d 844, 849 [264 P.2d 539]; *Sutter Hospital* v. *City of Sacramento* (1952), 39 Cal.2d 33, 39 [244 P.2d 390]; *Watchtower Bible & Tract Soc.* v. *County of Los Angeles* (1947), *supra,* 30 Cal.2d 426, 428.) "The provisions of . . .[California's] Constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise." (Const., art. I, § 22.) The justices of this court, regardless of personal views on social, political, economic or religious subjects, are in duty bound to support the Constitution and laws of this state. "The powers of the government of . . . California shall be divided into three separate departments—the legislative, executive, and judicial; and no person charged with the exercise of powers properly belonging to one of these departments shall exercise any functions appertaining to either of the others, except as in this Constitution expressly directed or permitted." (Const., art. III, § 1.) Obedient to my concept of judicial duty I must apply the firmly established principles of construction above delineated, give effect to the plain intent and specific language of the framers of section 1c of article XIII of the Constitution, respect the principle of division of powers of government above quoted, and hold unauthorized the purported exemption of property, however laudatory the objectives, which is sought to be sustained on the sole basis that the property is "used exclusively for school purposes of less than collegiate grade"—a use which is not of a character specified in the constitutional authorization, and which is therefore beyond the power of either the Legislature or this court to write into the Constitution.

The judgment of the superior court, following the law, should be affirmed.

Shenk, J., and Carter, J., concurred.

Respondent's petition for a rehearing was denied July 5, 1956. Shenk, J., Carter J., and Schauer, J., were of the opinion that the petition should be granted.