[Civ. No. 59428. Second Dist., Div. One. Nov. 30, 1981.]

SANTA CATALINA ISLAND CONSERVANCY, Plaintiff and Respondent, v.
COUNTY OF LOS ANGELES et al., Defendants and Appellants.

222

**COUNSEL**

George Deukmejian, Attorney General, Edmond B. Mamer and Patti S. Kitching, Deputy Attorneys General, John H. Larson, County Counsel and Raymond G. Fortner, Jr., Deputy County Counsel for Defendants and Appellants.

Latham & Watkins, David H. Vena, Donald P. Baker, John J. Clair, Jr., and Joseph J. Wheeler for Plaintiff and Respondent.

OPINION

**SPENCER, P. J.—**

INTRODUCTION

Defendants Los Angeles County and the California Board of Equalization appeal from a judgment in favor of plaintiff, the Santa Catalina Island Conservancy (Conservancy). After the Board of Equalization denied the Conservancy's claim for exemption from property taxes pursuant to Revenue and Taxation Code sections 214 and 214.02, the Conservancy sought a refund of ad valorum property taxes paid for the tax years 1975-1976, 1976-1977, 1977-1978 and 1978-1979, and a declaration that section 214.02 was constitutional. The trial court found that sections 214 and 214.02 are constitutional and that the property owned by the Conservancy on Santa Catalina Island was, with limited exceptions, entitled to the welfare exemption provided therein.

STATEMENT OF FACTS

*Background*

The Conservancy was organized in 1972 as a California nonprofit corporation for the purpose of preserving open space land for the pursuit of recreation and enjoyment of scenic beauty on Santa Catalina Island (Catalina), and for the preservation of native plants and animals, biotic communities, and geological and geographical features of educational interest. The Conservancy has received exemptions from federal and state income taxes which are premised in part on findings by the respective taxing authorities that the Conservancy is organized and operated exclusively for charitable purposes.

During the period from December 1973 to February 1974, the shareholders of the Santa Catalina Island Company donated all of the company's issued and outstanding shares of class A common stock to the Conservancy. Among the assets of the Santa Catalina Island Company was the fee title to Catalina.

In February 1974, the Santa Catalina Island Company granted a 50-year Open Space Easement (Gov. Code, § 65560, subd. (b)(2)) to Los Angeles County on 41,000 acres of Catalina. In granting the easement, the company reserved the right to use, maintain, regulate and

charge fees for the use of interior roads and to build lodges, hotels, or other public accommodation facilities on land subject to the easement, as well as certain other rights not pertinent herein. The easement provides for the preservation of the open space character of Catalina and protection of wildlife, plants, and geological and archeological sites. In addition, the easement assures the availability of the land for use by the public for recreational, scientific, educational and scenic enjoyment purposes. As a result of the Open Space Easement, the Santa Catalina Island Company received a substantially reduced market value tax assessment of the property subject to the easement.

In February 1975, the Santa Catalina Island Company redeemed the shares of stock which had been donated to the Conservancy by conveying the fee title to 42,000 acres of Catalina to the Conservancy. With the exception of Rancho Escondido (lot 60), all of the land subject to the Open Space Easement was included in the acreage conveyed to the Conservancy. By the terms of article IX of the Conservancy's articles of incorporation, the land in question became irrevocably dedicated to charitable purposes when title vested in the Conservancy.

*Operation of the Conservancy*

The primary power to direct the Conservancy rests with the benefactors, among whom members of the Wrigley family have been prominent.[1] At the time of trial, the benefactors of the Conservancy were William Wrigley; Robert Given, Director of the University of Southern California Catalina Marine Science Center; and Claude Brooks, an employee of the Chicago-based William Wrigley, Jr., Company. Benefactors are elected by the Conservancy board of directors. A majority of benefactor members constitutes a quorum at any meeting of members and their majority vote will decide any question brought before a membership meeting.

The Conservancy board of directors is elected at annual membership meetings and, in turn, elects the Conservancy officers. The Conservancy board of directors and officers from 1975 to 1977 were Douglas A. Probst, president and managing director (formerly employed by the Santa Catalina Island Company or its subsidiary); Hollis W. Moyse,

---

[1]Members of the Wrigley family were substantial or majority shareholders in the Santa Catalina Island Company from 1919 until the shares were donated to the Conservancy in 1974.

controller of the William Wrigley, Jr., Company; and Malcolm J. Renton, retired vice president of the Santa Catalina Island Company.

*Natural Character of the Island*

Catalina is one of eight Channel Islands. The island is approximately 21 miles long and varies in width from approximately one-half mile at the isthmus to a maximum of approximately eight miles for a total land area of approximately 48,438 acres. Elevations range from sea level to the 2,109-foot height of Mt. Orizaba.

The island rises abruptly from the water with, however, a platform extending for some distance offshore. The platform has an approximate width of one mile on the landward or channel side and two miles on the ocean side. It provides a suitable habitat for submarine gardens.

Geologically, the island may be described as the upper portion of a fault block which rises approximately one mile from the ocean floor. The uppermost remnants of the fault block are visible as a single ridge which traverses the island from end to end without a marked break except at the isthmus. Mt. Orizaba and Mt. Blackjack are the most notable peaks along the ridge. The bedrock geology of the island is pretertiary metamorphic rock and, in this respect, Catalina differs from the other Channel Islands. This rock is the oldest known on the island or the adjacent ocean bed, and is visible in outcroppings on approximately one-half of the island.

The main portion of the island is composed of Franciscan complex rock, which is rare in Southern California. There are limestone deposits containing fossils of the Miocene Era and marine terrace deposits south of Little Harbor and along the edge of Avalon Canyon as well as wave terraces in the Salte Verde area. The surface of the island is generally dissected by steep, geologically youthful canyons which, in combination with the sharp ridges, create a generally rugged topography. The rugged shoreline of the island is generally characterized by high, precipitous sea-cliffs which reach a height of approximately 1,400 feet at the Palisades. The western end of the island contains a small, level coastal plain. Many of the most significant geological features may be observed from hiking trails and from the roads used by hikers, the motor tours and other motorists. Catalina is accessible by private and commercial vessels and aircraft and is visited by over 500,000 people per year.

There are 393 species of plant life native to Catalina in addition to 150 species introduced from the mainland. Of the native species, six are endemic to the island (native to that one geographical region only). Of the endemic species, the Catalina Ironwood is the least prevalent. It is found in groves in canyons (primarily on the channel side) from Gallagher's to Bullrush Canyon, on mountain slopes (including the east slope of Mt. Blackjack) and in Ironwood Gulley on the isthmus. Many of the groves are in inaccessible areas, but one of the largest and most lush groves is along Skyline Drive, making it readily accessible to users of the drive and hikers. The Conservancy has been active in developing techniques for the propagation of Catalina Ironwood seedlings.

The Mountain Mahogany is an endemic species which occurs only in the Salte Verde Canyon area. St. Catherine's Lace, Yerba Santa, the Live Forever and the Catalina Manzanita are endemic species with a wide distribution on the island. The Catalina Current is found elsewhere only in All Saints' Bay, British Columbia; on the island, it ranges along Pebbly Beach, Avalon, Gallagher's and Banning Canyon as well as the Cherry Cove and Fourth of July Cove area west of the isthmus.

Many of the native species are organized into subcommunities inhabiting a variety of environments. There is a Pacific Headlands plant community near Little Harbor, as well as a special maritime desert community. The north and east slopes of the island contain typical chapparel communities, while the arid rocky ridges form a separate habitat. A biotic community of coastal sage inhabits the steep canyon slopes, and the coastal plain contains grasslands communities which provide basic food for herbivores.

The Catalina Grey Fox is an endemic species which ranges over a substantial portion of the western coastal interior and the central portion of the island. Recent studies and field observations suggest that an endemic species of the two-striped garter snake exists in the Cottonwood Canyon area.

Feral goats and pigs are found over wide areas of the island. The greatest populations of goats are found on the east end, the west end, and the northern shore; while the highest concentrations of pigs occupy areas which are relatively free of goats. Bison were introduced on Catalina in 1921 and the present population of approximately 400 ranges throughout the island except in those areas which have been overgrazed by goats.

California mule deer were introduced to the island in the 1930's in cooperation with the Fish and Game Department. The current population of between 500 and 1,000 ranges over most of the island, but tends to be concentrated in Bullrush, Middle, Cap and Cottonwood Canyons. Blackbuck antelope were introduced in 1973 and a herd of approximately 12 antelope is currently confined at the lower end of Cottonwood Canyon.

In addition to the mammalian and reptilian residents, Catalina has a substantial bird population of which two species, the Catalina California quail and Bewick's wren are endemic. The quail is found in every area of ground cover, while Bewick's wren frequents coastal sage scrub, chaparrel and wooded canyons. The remaining native, resident, visiting and migrating species inhabit a variety of environments ranging from the island coast, open fresh water areas and bogs or marshes to open fields, grasslands, chaparrel, scrub brush and woodland areas.

*Activities of the Conservancy*

The Conservancy provides a wide variety of recreational and scenic enjoyment activities. Upon registering and obtaining a permit, a system of roads and numerous trails allows visitors to hike into any area of Conservancy land free of charge. Two Conservancy sites at Mt. Blackjack and Little Harbor provide overnight camping facilities, for a moderate user fee, which can accommodate a total of approximately 200 campers, while Ben Weston Beach provides day camping facilities which are accessible from land or sea. All three campsites are presently managed for the Conservancy by the Los Angeles County Department of Parks and Recreation. In addition, there are more than 10 undeveloped coastal sites open to the public, many of which are suitable for camping and have trails leading into the interior. These sites are frequented by the substantial number of people who visit the island by private boat and utilize the various free anchoring locations or the 302 private moorings which are not owned or operated by the Conservancy. The Conservancy also assists in providing recreational, educational and natural history experiences to five youth groups and the Catalina Island School by leasing various coves and beaches to these organizations. From 1975 to 1977, between 600 and 11,000 campers used public fee campsites each year, a minimum of 66,000 campers used leased camps annually, and approximately 1,850 to 2,500 hikers were issued permits annually. However, not all hikers bother to obtain permits.

Visitors to Catalina who do not desire to hike or camp, or who are physically unable to do so, may purchase one of two guided motor tours into the interior of Conservancy property. The Inland Motor Tour travels over approximately 30 miles of roads within the Conservancy's boundaries for a period of more than three hours; tour guests are informed of the plant and animal life which they observe on the tour. The Skyline Drive tour covers ten miles of roads within the Conservancy's boundaries and exhibits an area where five rare plant forms are found together only on the island. The Conservancy contracts with the Santa Catalina Island Company to provide these tours, thereby avoiding the expenditure of an additional payroll and other overhead costs as well as a large capital investment. The Conservancy has been approached by other companies regarding the tour franchise and has discussed the fees and tour requirements, but has reached no agreements to extend alternative franchises. The Santa Catalina Island Company has been operating the tours since the late 1940's and presently pays the Conservancy road use fees and donations from each tour ticket sold for the continued privilege of doing so. The tours provide access to the interior for approximately 40,000 people each year.

Bicyclists are also permitted to use Conservancy roads. From 1975 to 1977, bicyclists were limited to groups accompanied by a Conservancy ranger and were charged a small fee. Since 1977, bicyclists have been permitted to use the roads in small unaccompanied groups without charge.

An additional recreational opportunity, as well as an important element of the Conservancy's wildlife management program, is provided by guided bow and gun hunting programs conducted on various parts of Catalina. The Conservancy contracts with Doug Bombard Enterprises, which has approximately 25 years of experience in hunting activities on the island, to conduct limited bow and gun hunting programs which are offered to members of the general public with valid California hunting licenses. All gun hunting is done in groups of three to five hunters under the direct supervision of an experienced guide and is limited to predesignated areas of the island. During the early part of the October-November deer season, hunting is limited to weekdays to minimize interference with hikers and campers. Thereafter, the Mt. Blackjack campsite, which is not popular at that time of year, is closed. Quail are also hunted in October and November in years when they are abundant and population control is desirable. Boar and goats are hunted in January, February and March. The hunting tag fees range from $75 per day

for quail to $95 to $110 per day for boar and goat. The gun hunting fees are $95 per day and include lodging and meals at the Harbor View Inn, a facility outside Conservancy premises and in which the Conservancy has no interest.

Bow hunting is conducted from three camps, one of which is located in the Goat Harbor area, and two of which are located west of the isthmus. Each camp of 10 to 15 hunters is supervised by an experienced guide; the hunters are transported by the guide to designated areas and hunt their way back to the camp. Boar and goat hunts conducted in March, April and May generally last from Friday noon through Sunday. Bow hunting fees are considerably more modest than gun hunting fees, but do not include camping equipment or meals.

The species hunted, the number of animals which may be taken, the periods of the year in which hunting takes place,[2] and the approximate price to the public are controlled by the Conservancy. Hunting is considered to be the best means of wildlife management. The monitoring and regulation of the animal populations, particularly the grazing species, is essential to achieve a balance between the population and the food supply so that the watershed is not overgrazed and endemic plants are protected. While some control is achieved by fencing, this is inadequate. Trapping is not considered an acceptable alternative to hunting; it is very difficult to accomplish in much of the terrain, would involve considerable expense, has some cruel aspects, and is not as effective. Using Conservancy employees to hunt would not only eliminate a recreational opportunity, but would be very expensive and time consuming.

The Conservancy receives a portion of the revenue collected from hunters as well as a "tag fee" for certain animals taken. Because of the popularity of the hunting programs and the restrictions imposed by the length of the hunting season, wildlife management concerns, and safety requirements, not all members of the public who wish to hunt are able to do so, particularly in deer season. When applications exceed available openings, hunters are selected by lot or on a first-come, first-served basis.

During the various hunting seasons, hikers and campers are made aware of hunting activities and cautioned against hiking into areas being hunted. Hunting is not conducted in close proximity to established campgrounds.

[2]The California Fish and Game Department regulates the deer season.

In addition to recreation and scenic observation opportunities, the Conservancy promotes various educational and scientific activities. In furtherance of these goals, the Conservancy has established and operates protected areas, and fosters studies of plant and animal communities and ecology, natural history and archeology. Researchers from educational institutions have conducted scientific studies and investigations in the fields of animal behavior, archeology, geology and botany each year.

## CONTENTIONS

### I

Defendants contend initially that the trial court erred in holding that Revenue and Taxation Code section 214.02[3] is constitutional.

### II

Defendants further assert that article XIII, section 8 of the California Constitution provides a reduced valuation to open space lands and is mutually exclusive of the welfare exemption.

### III

Defendants aver that the evidence does not establish that the Conservancy's property is used exclusively for charitable purposes as required by section 214 and article XIII, section 4, subdivision (b).

### IV

Defendants contend that the evidence does not establish that the Conservancy's use of the property complies with the requirements of section 214, subdivisions (3), (4), and (5)..

### V

Finally, defendants assert that the evidence does not establish that the Conservancy's use of the property complies with the provisions of section 214.02.

---

[3]All references hereinafter are to the Revenue and Taxation Code unless otherwise specified.

DISCUSSION

I

Defendants contend that the trial court erred in holding section 214.02 constitutional in that the Legislature exceeded the authority to exempt property from taxation granted by article XIII, section 4, subdivision (b) of the California Constitution. We disagree.

Section 4, subdivision (b) of article XIII (adopted Nov. 5, 1974, and transferred verbatim from § 1c) states: "The Legislature may exempt from property taxation in whole or in part: (b) Property used exclusively for religious, hospital, or charitable purposes and owned or held in trust by corporations or other entities (1) that are organized and operating for those purposes, (2) that are nonprofit, and (3) no part of whose net earnings inures to the benefit of any private shareholder or individual." The validity of the statutory exemption which section 214.02[4] grants to property "used exclusively for the preservation of native plants or animals, or biotic communities, or geological or geographical formations of scientific or educational interest, or open-space lands used solely for recreation and for the enjoyment of scenic beauty" depends on whether the enumerated purposes may be regarded as charitable within the meaning of section 4, subdivision (b).

It is well settled that the word "charitable," as one of three descriptive words used in section 4, subdivision (b) of article XIII, is to be broadly interpreted rather than narrowly construed in favor of taxability. (*Stockton Civic Theatre* v. *Board of Supervisors* (1967) 66 Cal.2d 13, 18 [56 Cal.Rptr. 658, 423 P.2d 810]; *Lundberg* v. *County of Alameda* (1956) 46 Cal.2d 644, 651 [298 P.2d 1]; *Y.M.C.A.* v. *County of L.A.* (1950) 35 Cal.2d 760, 768 [221 P.2d 47]; *Fredericka Home* v. *County of San Diego* (1950) 35 Cal.2d 789 [221 P.2d 68].)

---

[4]Section 214.02 provides: "Property used exclusively for the preservation of native plants or animals, or biotic communities, or geological or geographical formations of scientific or educational interest, or open-space lands used solely for recreation and for the enjoyment of scenic beauty, and which property is open to the general public subject to reasonable restrictions concerning the needs of the land and is owned and operated by a scientific or charitable fund, foundation or corporation, the primary interest of which is to preserve such natural areas, and which meets all the requirements of Section 214, shall be deemed to be within the exempted [sic] provided for in subdivision (b) of Section 4 and Section 5 of Article XIII of the Constitution of the State of California and Section 214."

A venerable line of California cases has defined the term "charity" as "a gift to be applied, consistently with existing laws, for the benefit of an indefinite number of persons either by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government." (*Estate of Halm* (1925) 196 Cal. 778, 782 [239 P. 307]; *Estate of Coleman* (1914) 167 Cal. 212, 214 [138 P. 992]; *Estate of Sutro* (1909) 155 Cal. 727, 736 [102 P. 920]; *Estate of Lennon* (1907) 152 Cal. 327, 329-330 [92 P. 870]; *Estate of Merchant* (1904) 143 Cal. 537, 543-544 [77 P. 475].) This definition was applied in *Stockton Civic Theatre* v. *Board of Supervisors, supra*, 66 Cal.2d 13 to hold a nonprofit civic theatre exempt from property taxes as a charitable organization. Charity further encompasses activities of a generally humanitarian nature, for the improvement and betterment of mankind, without regard to whether those activities provide relief for the destitute or benefit those who may be able to pay a portion of the cost. (*Lundberg* v. *County of Alameda, supra*, 46 Cal.2d 644, 650; *Y.M.C.A.* v. *County of L.A., supra*, 35 Cal.2d 760, 768.)

The protection and care of animals has been held to be a charitable purpose where the status of a trust or bequest was in controversy and the gift was for the benefit of the public. (*Estate of Coleman, supra*, 167 Cal. 212, 215.) And other jurisdictions have held that the preservation of the beauties of nature, the conservation and protection of wildlife, or the advancement of educational or scientific studies of natural environments for the benefit of the public are charitable purposes which may qualify a nonprofit organization for tax exemption. (See, e.g., *Noice* v. *Schnell* (1927) 101 N.J. Eq. 252 [137 A. 582, 52 A.L.R. 965]; *North Manursing Wildlife* v. *City of Rye* (1979) 48 N.Y.2d 135 [422 N.Y.S.2d 1, 397 N.E.2d 693]; *Mohonk Trust* v. *Board of Assessors* (1979) 47 N.Y.2d 476 [418 N.Y.S.2d 763, 392 N.E.2d 876]; *Nature Conservancy* v. *Town of Nelson* (1966) 107 N.H. 316 [221 A.2d 776]; *More Game Birds in America, Inc.* v. *Boettger* (1940) 125 N.J.L. 97 [14 A.2d 778]; but see *Holbrook Island Sanctuary* v. *Inhabitants of Town* (1965) 161 Me. 476 [214 A.2d 660].) The approach of other jurisdictions is in accord with the construction the United States Tax Court has given section 170(c)(2)(B) of the Internal Revenue Code. (26 U.S.C. § 170(c)(2)(B).) That statute permits a deduction from income taxes for contributions made to private organizations "organized and operated exclusively for religious, charitable, scientific,

literary, or educational purposes . . . ." The tax court has construed this language as qualifying a nature conservancy with stated objectives of preserving natural areas, features, flora, fauna and biotic communities (among other purposes) for status as a publicly supported entity organized for charitable purposes. (*Knapp* v. *Commissioner of Internal Revenue* (1977) 36 T. C. M. (CCH) 1576.)

It is beyond question that the public policy of this state promotes the preservation of ecological communities, native flora or fauna, important geological features, outstanding scenic values, and open-space recreational opportunities. (See, e.g., Pub. Resources Code, §§ 5019.71 [defining and providing for natural preserves], 5019.65 [state reserves], 5019.62 [state seashores], 5019.53 [state parks],[5] and 5811 [wetlands preservation].) The power of eminent domain may be exercised in furtherance of this public policy. (Pub. Resources Code, § 5006.) It thus appears that nonprofit organizations formed and conducted for the purpose of preserving natural environments and recreational opportunities for the benefit of the public come within the term "charitable" as defined by the decisions of our Supreme Court by lessening the burdens of government. Moreover, the Legislature has construed the term "charitable" as authorizing exemption of such organizations.

Section 4, subdivision (b) is an enabling provision, as was section 1c, which grants the Legislature power to provide exemptions within generally defined categories. As noted in *Lundberg* v. *County of Alameda, supra,* 46 Cal.2d 644, 651: "In acting under this section the Legislature must necessarily construe the terms of the provision in order to determine the extent of the authority conferred upon it." The enactment of section 214.02 in 1971 was a construction of the word "charitable" in section 1c as broad enough to include nonprofit organizations engaged in ecological preservation.

The legislative history behind the enactment of section 214.02 is clear. In 1970, the Assembly Committee on Revenue and Taxation held hearings and conducted studies to investigate alternative tax policies which would have a positive environmental influence on the future of the state. The staff report to the committee concluded that, due to an overreliance on property tax revenues, local governments were reluctant

---

[5]The above-referenced sections are part of article 1.7, added by Statutes 1978, chapter 615, and derived from article 1, added by Statutes 1939, chapter 94 (thereby creating a state park system).

to preserve open space areas, recreational areas, and ecologically valuable areas. Hence, land was becoming a vanishing resource subject to irreparable damage. (The Fiscal Implications of Environmental Control; an Appendix to: Final Rep. of the Assem. Com. on Revenue and Taxation, Interim Activities (1970) pp. 90-92.)

The report further noted testimony of the Nature Conservancy, a nonprofit corporation which acquires ecologically valuable lands and holds them for eventual transfer to public agencies. The Nature Conservancy stated that the absence of language in the Revenue and Taxation Code to specifically cover like organizations was causing the loss of its welfare exemption in some counties. (*Id.*, at pp. 93-94.) Finally, the study concluded that a state land acquisition program would involve an enormous capital investment requiring a substantial continuing revenue source.

Among the conclusions reached in the staff report was the following: "The property tax exemption provided under the existing welfare exemption should be broadened to include environmentally oriented nonprofit organizations that are preserving ecologically valuable areas." (*Id.*, at p. 96.) The committee adopted this recommendation and identified the interests served as "the preservation of native life forms, ecology and open space which is open to reasonable public use." (Final Rep. of the Assem. Com. on Revenue and Taxation (1970) p. 6.)

■ The presumption is in favor of the constitutionality of a statute; invalidity must be clear and unquestionable before the statute can be declared unconstitutional. (*California Housing Finance Agency* v. *Elliot* (1976) 17 Cal.3d 575, 594 [131 Cal.Rptr. 361, 551 P.2d 1193].) ■ Moreover, we cannot adopt our own interpretation of a constitutional provision without regard to the legislative construction, and, when the provision is capable of more than one reasonable meaning, the construction placed thereon by the Legislature carries great weight. (*California Housing Finance Agency* v. *Patitucci* (1978) 22 Cal.3d 171, 175 [148 Cal.Rptr. 875, 583 P.2d 729].)

■ Defendants rely heavily upon the history of section 1c in support of their argument that section 214.02 is unconstitutional. When section 1c was presented to the voters as a constitutional amendment in 1944, the official voters' pamphlet presented several arguments for and against the measure. Among the arguments in favor of passage were statements that (1) the organizations to be exempted would provide cer-

tain health and welfare services to the community and therefore pay for their own exemption by relieving the government from the provision of such services; (2) no large land holdings would thereby be exempted; and (3) schools other than colleges would not be exempted in view of the Legislature's express elimination of the term "educational" from the measure.

Defendants argue that the references to "health and welfare services" and "no large land holdings" define the limits of voter intent in approving section 1c. We note that the plaintiff in *Lundberg* v. *County of Alameda, supra,* 46 Cal.2d 644 made the same claim with respect to the statement that no schools would be exempt. In rejecting this assertion, the court stated: "Numerous other arguments were made, however, for and against adoption, and we cannot say which of the various statements. was relied on by the voters." (*Id.,* at p. 653.) We are in no better position to speculate as to the intent of the voters in approving the amendment and concur with the *Lundberg* court that the history of section 1c is inconclusive as to what was intended. The ambiguous and uncertain nature of the amendment's history does not justify a construction of the term "charitable" contrary to that established by the decisions discussed above and adopted by the Legislature in 1971. Accordingly, we conclude that section 4, subdivision (b) authorizes the exemption in question.

## II

Defendants further assert that article XIII, section 8 of the California Constitution provides a reduced valuation of open space lands and is mutually exclusive of the welfare exemption. Our perusal of the history of section 8 renders this premise insupportable.

Legislative interest in preserving agricultural lands from urban encroachment first surfaced in 1955 with the passage of the Greenbelt Law (Gov. Code, § 35009) to prevent annexation of lands "zoned and restricted for agricultural purposes exclusively," without owner consent. An effort at providing tax relief followed with the enactment of former Revenue and Taxation Code section 402.5 (repealed 1966) which directed county assessors to assess exclusively agricultural land at its use value, providing that "there is no reasonable probability of the removal or modification of the zoning restriction within the near future." In effect, this statute failed to provide adequate tax relief. (Land,

*Unraveling the Rurban Fringe: A Proposal for the Implementation of Proposition Three* (1968) 19 Hastings L.J. 421, 430.)

In 1962, a proposed constitutional amendment (Assem. Const. Amend. No. 4) which granted several kinds of preferential treatment for exclusively agricultural land, including mandatory assessment on the basis of use value, was defeated in the November general election. In the wake of this defeat, the Legislature passed the Land Conservation Act of 1965 (Gov. Code, §§ 51200-51295) which provided tax relief in return for a voluntary surrender of development rights in 10-year contracts with local governments and the state. (Gov. Code, §§ 51243, 51244.)

The Land Conservation Act was immediately followed by another proposed constitutional amendment in 1966 (Sen. Const. Amend. No. 3) which, after its passage in the November general election, added article XXVIII[6] to the California Constitution. Section 2 of article XXVIII authorized the Legislature to: (1) Define "open space lands"; (2) specify enforceable use restrictions for recreation, enjoyment of scenic beauty, *use of natural resources*, or *production of food or fiber*; (3) provide criteria to determine when land is subject to such specified use restrictions, and (4) define the measure of value consistent with such use restrictions. Thereafter, in 1967 and 1969, the Legislature enacted article 1.5 of the Revenue and Taxation Code (§§ 422-429; amended in 1974 to conform with article XIII, § 8 [Stats. 1974, ch. 311].) It is clear that the statutory scheme embodied in article 1.5 contemplates providing tax relief to open-space land under enforceable restriction which is nonetheless devoted to profitable commercial uses. (§ 423 [valuation by capitalization of income, generally,]; § 423.5 [valuation of open space commercial timberland at present worth of future harvest income]; § 427 [assessor may consider additional value of mines, minerals and quarries].) Given the history behind the adoption of article XXVIII, this is clearly the only reasonable construction of the property tax valuation provisions enacted under its enabling provisions.

---

[6]Article XXVIII was repealed November 5, 1974 and transferred to section 8 of article XIII: "To promote the conservation, preservation and continued existence of open space lands, the Legislature may define open space land and shall provide that when this land is enforceably restricted, in a manner specified by the Legislature, to recreation, enjoyment of scenic beauty, use or conservation of natural resources, or production of food or fiber, it shall be valued for property tax purposes only on a basis that is consistent with its restrictions and uses."

Section 8 of article XIII not only permits, but directly contemplates, the use of open space lands in commercially profitable ventures. In contrast, subdivision (b) of section 4 requires that no profit inure to the benefit of any shareholder or private person. Open space lands dedicated to charitable purposes may not be farmed, harvested, mined or quarried for purely commercial purposes. Thus each section serves a distinct public purpose. Land previously subjected to enforceable restriction and granted tax relief pursuant to section 8 may well become more valuable to the public when the commercial enterprises conducted thereon, or to which the land is amenable, are prohibited by dedication of the land to charitable purposes. Accordingly, section 8 cannot be considered mutually exclusive of section 4, subdivision (b).

## III

Defendants' averment that the evidence does not establish that the Conservancy's property is used exclusively for charitable purposes as required by section 214 and article XIII, section 4, subdivision (b) runs contrary to the established law of this state.

### ■ *Charitable Purpose*

Defendants argue that Conservancy land is not used for a charitable purpose in that the Conservancy has made no gift to the community as a whole or to an unascertainable portion thereof as required by *Stockton Civic Theatre* v. *Board of Supervisors, supra,* 66 Cal.2d 13, 19-20. Rather, it is argued, the general inaccessibility of the island and its interior terrain perpetuates a recreational reserve for the privileged few. Defendants point to a commercial round trip air fare of $72 to $92 for a family of four or commercial round trip boat fare for the same family of $25 to $30 during the years in question as illustrative of the elitist nature of access to Catalina. In addition, defendants assert that the permit requirement for hikers, bicyclists and campers (albeit free) who wish to use Conservancy property, a camping fee of approximately $5.40 per night charged for a family of four, the existence of the hunting program, and a cost of $22.50 if the same family wished to take the Inland Motor Tour add to the restrictive, privileged nature of Conservancy property.

We can only assume that defendants construe the term "unascertainable portion of the community" as meaning every conceivable type of person from the most destitute or disabled to the most affluent or energetic. Our application of section 214 to the instant case is governed by

the approach adopted by the courts in analogous situations. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937].) We consider defendants' construction to be unreasonable in the extreme; it is not aided by defendants' reliance on *California College of Mortuary Science* v. *County of Los Angeles* (1972) 23 Cal.App.3d 702 [100 Cal.Rptr. 558], wherein the court held that a school of mortuary science benefited primarily that definite segment of society which comprised the funeral service industry. It is well settled that neither financial nor other limitations are determinative of whether a benefit is conferred on the general community. (See, e.g., *Cedars of Lebanon Hosp.* v. *County of L. A.* (1950) 35 Cal.2d 729 [221 P.2d 31, 15 A.L.R.2d 1045] [fee-charging hospital]; *Greek Theatre Assn.* v. *County of Los Angeles* (1978) 76 Cal.App.3d 768 [142 Cal.Rptr. 919] [fee-charging theater offering professional performances]; *San Francisco Boys' Club, Inc.* v. *County of Mendocino* (1967) 254 Cal.App.2d 548 [62 Cal.Rptr. 294] [membership camp]; *Sarah Dix Hamlin School* v. *City etc. of San Francisco* (1963) 221 Cal.App.2d 336 [34 Cal.Rptr. 376] [fee-charging, limited-entry private school]; *Fifield Manor* v. *County of Los Angeles* (1961) 188 Cal.App. 2d 1 [10 Cal.Rptr. 242] [fee-charging retirement homes for the middle class].) In any event, the more than 500,000 annual visitors to Catalina and more than 100,000 annual users of Conservancy property belie the charge of elitism.

Moreover, defendants focus solely on the recreational availability of Conservancy property in assessing the benefit to the community. The preservation of a unique, partially wild, island environment containing many exceptional geological features, as well as many varieties of rare, endemic and native plant and animal species, provides incalculable benefit to every member of society in an era of scarce and vanishing ecological resources. Thus, apart from any economic or other restrictions imposed on the recreational use of Conservancy property, the Conservancy confers a benefit on the general community.

Defendants argue further that in view of the Open Space Easement, there was no gift to the people in the creation of the Conservancy. We disposed of this argument in our discussion of the relative purposes of section 4, subdivision (b) and section 8 of article XIII of the California Constitution. The irrevocable dedication of the land to charitable purposes forfeited the various profit-making opportunities previously available on the land. It is of no consequence whether profit-making ac-

tivities were formerly in operation; the *opportunity* to undertake such activities has ceased to exist.

*Exclusive Use*

 Defendants' argument that Conservancy property is not "used exclusively" for charitable purposes is based on the assertion that the motor tours are intentionally profit-making and the hunting program is both intentionally profit-making and not reasonably necessary and inci-dental to the accomplishment of charitable activities. Again, defendants ignore compelling precedent. The threshold question is not what revenues are derived from an activity, but the *purpose* for which it is conducted. Accordingly, "any property which is used exclusively for any facility which is incidental to and reasonably necessary for the accom-plishment of [the charitable] purpose [ ]; or, in other words, for any facility which is reasonably necessary for the fulfillment of a generally recognized function of a complete modern [operation]...." comes within the welfare exemption. (*Cedars of Lebanon Hosp.* v. *County of L.A., supra*, 35 Cal.2d 729, 736.)

The principle has been extended to property devoted by a hospital to housing nurses and other personnel for a fee (*id.*, at pp. 739-742), and dormitories operated for rental to tenants by a Y.M.C.A. (*Y.M.C.A.* v. *County of L.A., supra*, 35 Cal.2d 760, 767-772.) In addition, a logging operation hired out to independent contractors by a boys' club camp has been similarly treated. (*San Francisco Boys' Club, Inc.* v. *County of Mendocino, supra*, 254 Cal.App.2d 548, 561.)

It is only when an activity which is not reasonably *necessary* to the charitable purpose is placed in commercial competition with public businesses that it is deemed not charitably incidental. (*Y.M.C.A.* v. *County of L.A., supra*, 35 Cal.2d 760, 772-776.) Here the mo-tor tours provide an instructive opportunity for many persons to see and enjoy Conservancy property who otherwise might not be reached. Thus they are reasonably necessary and incidental to the instructive, preser-vational and recreational purposes of the Conservancy. Defendants do not seriously question this.

However, they do challenge vigorously the hunting program as not reasonably necessary and incidental to any purpose of the Conservancy. Their stance ignores the Conservancy's dedication to the preservation of the nearly 400 native plant and animal species, as well as distinct biotic communities, within its boundaries. Catalina is populated by many

grazing herbivores which were introduced by various means over the centuries. Certain areas are either presently overgrazed or could rapidly become so. Overgrazing poses a threat to many varieties of native plant life and, in addition, certain native animals require ground cover. Obviously, under these circumstances, harvesting, a game management technique, is essential. In addition to its recreational value, the hunting program is a logical and effective tool to the game management end. As such, it is an operation which "is compatible with and not hostile to [the land's] use for the charitable activity. Being a part and parcel of that use, it does not detract from, or destroy, the exclusiveness of that use." (*San Francisco Boys' Club, Inc. v. County of Mendocino, supra,* 254 Cal.App.2d 548, 560.)

Once the threshold determination is made that the purpose for which the activity is undertaken is proper, the generation of revenue is irrelevant where the receipts are not income from property *held by the charitable organization* solely for investment or commercial (i.e., intentionally profit-making) purposes. (*Id.,* at p. 559; see also *Christ the Good Shepherd Lutheran Chruch v. Mathiesen* (1978) 81 Cal.App.3d 355, 363 [146 Cal.Rptr. 321].) Accordingly, neither the motor tours nor the hunting program may be charged to the Conservancy as intentionally profit-making activities, despite the employment of independent contractors, inasmuch as they are conducted for exempt purposes.

## IV

Defendants contend that the evidence does not establish that the Conservancy's use of the property complies with the requirements of section 214, subdivisions (3), (4), and (5). We disagree.

### Actual Use of Only Amount of Land Reasonably Necessary

Section 214, subdivision (3) requires as a condition of exemption that "[t]he property is used for the actual operation of the exempt activity, and does not exceed an amount of property reasonably necessary to the accomplishment of the exempt purpose; . . . ." Once again, defendants focus primarily on the recreational uses of the property, rely heavily on the limited amount of land occupied by campsites and motor tour routes, denies the exempt value of the hunting program, and dismisses as negligible the number of hikers using Conservancy property. We need not engage in speculation as to the amount of Conservancy property actually used for the above enumerated recreational activities, all of which are exempt; the property is actually and actively used for other

exempt purposes. Not only are hundreds of diverse plant, animal and biotic communities available for preservation, but the Conservancy is actively engaged in their protection; in advancing the propagation of endemic species; and in promoting marine, biological, and ornithological scientific studies of these precious resources. In addition, Catalina contains many noteworthy or unique geological and geographical formations which are worthy of preservation; the Conservancy advances educational and scientific interest in these phenomena. Accordingly, any future plans which the Conservancy has for the property can only enhance the existing, actual use thereof for exempt purposes.

In addressing the issue of the amount of land reasonably necessary for the Conservancy's exempt purposes, defendants apparently take the position that the Conservancy must prove that each of its 42,000 acres is used specifically for an exempt purpose. We consider this to be too narrow a view. As noted in *San Francisco Boys' Club, Inc.* v. *County of Mendocino, supra*, 254 Cal.App.2d 548, 553: "The Legislature unquestionably has power under the constitutional provision to limit the exemption to 'any portion' of the property it may designate. Until it acts, and in the absence of any showing of subterfuge or fraud, the determination of those responsible for carrying out the eleemosynary purposes of the [organization] should be respected [as to the amount of land reasonably necessary]." The diverse distribution of native plants, animals and biotic communities, geological and geographical features, game management concerns, and recreational activities spans every manner of environment or terrain on Catalina. Whether 30,000 or 42,000 acres, or any number in between, is reasonably necessary to accomplish the Conservancy's charitable purposes is best left to the judgment of the Conservancy.

■ *More Advantageous Pursuit of Business*

Subdivision (4) of section 214 provides: "The property is not used or operated by the owner or by any other person so as to benefit any officer, trustee, director, shareholder, member, employee, contributor, or bondholder of the owner or operator, or any other person, through the distribution of profits, payment of excessive charges or compensations or the more advantageous pursuit of their business or profession; ..."

Defendants argue that Doug Bombard Enterprises, through operation of the hunting program, and the Santa Catalina Island Company, through operation of the motor tours, used Conservancy property for the more advantageous pursuit of their businesses. Unfortunately, the

argument ignores reality. Doug Bombard Enterprises had been engaged in operating hunting programs for approximately 20 years when the Conservancy became owner of the property in question; the evidence shows that hunting revenues steadily *declined* after the Conservancy assumed ownership. Surely this business enjoyed no more, and possibly less, advantageous a pursuit of this particular enterprise. Similarly, as the former owner of the subject property, the Santa Catalina Island Company had conducted motor tours for more than 40 years. Once the Conservancy assumed ownership, the Santa Catalina Island Company was obliged to pay road use fees and a portion of its tour revenues for the continued privilege of conducting the motor tours. This can hardly be termed a more advantageous pursuit of that particular business enterprise. The advantageous, or profitable, pursuit of one's business is not what is prohibited; rather, it is only the *more* advantageous pursuit. (See *Greek Theatre Assn.* v. *County of Los Angeles, supra*, 76 Cal. App.3d 768, 783.) Moreover, an organization's realization of unintended profit does not affect its otherwise exempt status. (*Id.*, at pp. 781-782.)

### ▮ *Fraternal or Lodge Purposes*

Section 214, subdivision (5) requires for exemption that "[t]he property is not used by the owner or members thereof for fraternal or lodge purposes, or for social club purposes except where such use is clearly incidental to a primary religious, hospital, scientific, or charitable purpose; . . ." Defendants' argument that the hunting program is akin to a lodge or social club, in that only those hunters who could afford $95 per day could enjoy this recreational opportunity hardly merits comment. First, the hunting program is not used by the Conservancy or its members as a social club; it is open to any member of the public who wishes to participate. Demand is so high during some seasons that not all aspiring hunters can be accommodated; participants are then selected by lot or on a "first come" basis. Second, the hunting program is *clearly incidental* to a primary charitable purpose of the Conservancy and thus not within the provisions of subdivision (5).

### V

There is no merit to defendants' final assertion that the evidence does not establish that the Conservancy's use of the property complies with section 214.02. In part, defendants base this contention on the argument: (1) that the overgrazing of certain areas of Catalina by

herbivores negates any purpose of preserving native plants, and (2) there is no evidence that native plants and animals are endangered species which require preservation. As noted previously, the Conservancy's game management program is directly aimed at controlling the overgrazing of herbivores and thus at encouraging the preservation of plant species. Further, not all native plant species are subject to attack by overgrazing; some species are beyond the range of grazing herbivores. As to the lack of evidence of endangered species, that classification is not codified as a requirement of section 214.02. Moreover, a number of the plant and animal species are endemic to Catalina. An endemic species occurs only in that particular geographic location; if such species are not preserved where they occur, they necessarily perish.

Secondarily, defendants' argument is a reprise of their assertion that the Conservancy has not proven that all 42,000 acres are necessary for the Conservancy's charitably exempt purposes. In this version, defendants take the position that *each* exempt purpose must justify use of the entire acreage. The specious nature of the argument becomes more apparent by use of an analogy. In the instance of a nonprofit Catholic teaching hospital, operated by a convent, no one would seriously contend that the convent would have to prove the use of the nursing and medical school facilities and hospital premises for religious purposes; that the schools and hospital would have to prove the use of the convent for teaching and hospital purposes; or that the hospital would have to prove the use of the convent and teaching facilities for medical purposes. Each use is itself exempt and all are part of an integrated operation. Logically, it is only necessary that *all* exempt uses utilize the entire property. Beyond question, the Conservancy complies with the requirements of section 214.02.

The judgment is affirmed.

Lillie, J., and Jakes, J.,* concurred.

Appellants' petition for a hearing by the Supreme Court was denied January 27, 1982.

---

*Assigned by the Chairperson of the Judicial Council.