[No. A050822. First Dist., Div. One. June 22, 1992.]

CLUBS OF CALIFORNIA FOR FAIR COMPETITION et al., Plaintiffs and Appellants, v.
DONALD KROGER, as County Tax Assessor, etc., et al., Defendants and Respondents;
YOUNG MEN'S CHRISTIAN ASSOCIATION OF OAKLAND, Real Party in Interest and Respondent.

## COUNSEL

Wendel, Rosen, Black, Dean & Levitan, Les A. Hausrath and Linda R. Beck for Plaintiffs and Appellants.

Daniel E. Lungren, Attorney General, Richard F. Finn and Marguerite C. Stricklin, Deputy Attorneys General, Kelvin H. Booty, Jr., County Counsel, and James F. May, Assistant County Counsel, for Defendants and Respondents.

Crosby, Heafey, Roach & May, Jay R. Martin, Richard de Saint Phalle, Paul D. Fogel and Kathy M. Banke for Real Party in Interest and Respondent.

## OPINION

NEWSOM, J.—This appeal is from a judgment of the Superior Court of Alameda County dismissing a petition for writ of mandate brought by Clubs of California for Fair Competition, a nonprofit corporation, and Oakland Athletic Club Group, a general partnership (hereafter appellants), against Donald Kroger, as Alameda County Tax Assessor, the California State Board of Equalization, and the Young Men's Christian Association of Oakland, a nonprofit corporation (hereafter YMCA), as real party in interest. The first amended petition, filed on February 1990, challenged the property tax exemption of a newly constructed YMCA building in Oakland, known as the New Oakland YMCA, and sought an order compelling the tax assessor and the State Board of Equalization to include it on the tax rolls for 1990 and three preceding years. The YMCA, joined by the Alameda County Tax Assessor and the State Board of Equalization, filed a motion for summary judgment, and appellants countered with a similar motion for summary judgment or summary adjudication of the issues. In a statement of decision filed May 25, 1990, the court granted YMCA's motion and denied appellants' motion. Appellants now appeal from a judgment dismissing the petition entered on June 28, 1990.

In October 1986, the YMCA opened a new facility at 2350 Broadway in Oakland, California, which replaced an older building four blocks away that had served as the principal YMCA facility in Alameda County for almost seventy-five years. Constructed at a cost of $10 million, the New Oakland YMCA was three times the size of the older building and possessed many greatly improved features. The facility attracted many new members even though the YMCA sharply increased membership fees to pay for the cost of construction. By February 1990, adult memberships had increased from

1,240 to 4,673, and youth memberships from 200 to 1,163. While the new facility maintains a wide range of programs, with a strong emphasis on youth, most of its patrons are now adults paying substantial membership fees to participate in athletic, physical fitness and wellness activities. Appellant contends that the primary activity of the new facility has thus become that of "a health club for affluent adults," competitive with other commercial health clubs, which no longer qualifies for the welfare tax exemption.

In February 1990, the membership dues for adults were $44 per month with an enrollment fee of $400. The dues for youths under 18 years of age were $7.50 per month with no enrollment fee. Although youths comprise only about 20 percent of the membership, they participate more actively than adults in YMCA programs. A report on YMCA programs in 1989 indicated that youths accounted for 41 percent of all recorded uses. Professing never to refuse membership to anyone who cannot afford it, the YMCA offers both adults and youths reduced fees based on an individual's ability to pay and, in an appropriate case, will waive fees entirely. In 1989, it had approved reduced fees or fee waivers for about 18 percent of the membership.

Nonmembers also may use the YMCA under various conditions. Anyone can buy a one-day guest pass for $10, and senior citizens are required to pay only $3. Youth members of other YMCA branches in Alameda County enjoy the same privileges as youths belonging to the New Oakland YMCA itself. Most visiting youth members belong to east and west Oakland branches which charge annual dues of only $25. A number of educational, philanthropic, and civic organizations use meeting rooms and athletic facilities. In addition, nonmembers are free to participate in many programs, ranging from day camps to senior aerobics. While the YMCA kept no systematic records of nonmember use, it could document many of these uses "from secondary sources such as receipts." The records for 1989 revealed 4,031 uses by senior citizens buying a reduced-price guest pass, 2,606 uses by members of other YMCA branches in Alameda County, 2,445 uses by members of community organizations, and 10,730 uses by participants in YMCA programs. These documented nonmember uses amounted to about 7 percent of all uses of the facility in the year.

Most patrons of the New Oakland YMCA participate in organized programs as well as using open facilities such as the swimming pool or basketball courts. The YMCA offered no fewer than 129 programs in 1990 of which a large portion were devoted to youth. These included a day camp during vacation periods and directed activities before and after school for children ages five through twelve. The brochure describing these programs states that "[n]o family is denied participation in YMCA programs due to

financial status. Scholarships are available based on financial need." A neighborhood elementary school, scouting groups and a children's center used the facility on a regular basis. A sports program offered basketball, soccer and other sports to elementary and high school students, and a variety of swimming classes served children from preschool age to teens. The metropolitan YMCA conducts an annual fund raising campaign known as "Partnership-In-Youth" to enlist disadvantaged youths in these programs and to provide drug and truancy intervention.

Other community service functions include a relatively small number of programs serving senior citizens and the use of the YMCA building by educational, philanthropic, and civic organizations, such as Lion's Blind School, United Negro College Fund, Catholic Charities, Earthquake Relief Group and Volunteers of Alameda County. Apart from these relatively minor functions and the broad range of youth programs, the YMCA is devoted to activities serving adult members in the areas of athletics, physical fitness, wellness and recreation.

The core of the YMCA's program for adult patrons unquestionably consists of physical fitness and wellness activities. Health professionals encourage all patrons to undergo a physical fitness evaluation that will direct them to appropriate fitness activities. In addition, they offer cholesterol screening, weight control programs and stress management counseling. A weight room, a cardiovascular room with various exercise machines, and a Nautilus equipment room with 17 stations are available for individual use. A busy agenda of fitness programs and classes offer organized exercise opportunities for people of varying capacities and preferences. These include a wide range of aerobic classes, a "stretch and flex" class for older patrons, classes in strength training, yoga, aquatic fitness, group walks in the neighborhood, various running activities, a biking program, and a schedule of dance lessons in Afro-Haitian, "cardio funk," and adult jazz dance.

As a center for adult athletics, the YMCA offers facilities for swimming, basketball, volleyball, karate, squash, handball and raquetball. The staff provides lessons for several of these sports and arranges periodic competitions. For relaxation after physical exertion, the YMCA offers saunas, steam rooms and jacuzzis. While all these activities contain an element of recreation, other activities serve purely recreational ends. For example, the YMCA organizes an evening of Christmas caroling and parties for occasions such as Valentine's Day.

The Tax Assessor of Alameda County approved the YMCA's application for property tax exemption of the new facility in 1986 and the following two

years. In 1989, after receiving an informal protest from appellants' attorney, both the tax assessor and the State Board of Equalization met with YMCA officials and inspected the facility before again approving the tax exemption. The parties agree that the mandamus proceedings presented the issue of whether the public agencies exercised their discretion "under a proper interpretation of the applicable law" in approving the YMCA's tax exemption. (*Common Cause* v. *Board of Supervisors* (1989) 49 Cal.3d 432, 442 [261 Cal.Rptr. 574, 777 P.2d 610].) The factual disputes presented by the motions for summary judgment were so minor that they did not materially affect any issue. Hence, the application of the tax statutes to the essentially uncontradicted facts "present[s] questions of law to this court." (*J. C. Penney Ins. Co.* v. *State Bd. of Equalization* (1979) 94 Cal.App.3d 685, 691 [157 Cal.Rptr. 1].)

The availability of the tax exemption turns on the interpretation of the term "charitable purposes" in the California Constitution, article XIII, section 4, subdivision (b), and Revenue and Taxation Code section 214. The constitutional provision authorizes the Legislature to exempt from property taxation "[p]roperty used exclusively for religious, hospital, or charitable purposes and owned or held in trust by corporations or other entities . . . that are organized and operating for those purposes . . . ." As the provision is not self-executing, section 214 provides the effective exemption in closely parallel language. (*Stockton Civic Theatre* v. *Board of Supervisors* (1967) 66 Cal.2d 13, 16 [56 Cal.Rptr. 658, 423 P.2d 810].)

■ As a general rule, all tax exemption statutes are to be strictly construed (*English* v. *County of Alameda* (1977) 70 Cal.App.3d 226, 234 [138 Cal.Rptr. 634]), but the rule cannot be applied to this peculiar statutory context. Our high court has held that the "the language of the first part of section 214 of the Revenue and Taxation Code . . . must be given the same meaning as [the parallel provision in article XIII, section 4, subdivision (b) of the Constitution.]" (*Stockton Civic Theatre* v. *Board of Supervisors, supra,* 66 Cal.2d 13, 21.) A line of decisions has held that, as it appears in the Constitution, the term "charitable purposes" is to be construed broadly. (*Lundberg* v. *County of Alameda* (1956) 46 Cal.2d 644, 650 [298 P.2d 1]; *Stockton Civic Theatre* v. *Board of Supervisors, supra,* 66 Cal.2d 13, 18; *J. Paul Getty Museum* v. *County of Los Angeles* (1983) 148 Cal.App.3d 600, 606 [195 Cal.Rptr. 916].) Since the same term cannot be construed strictly and broadly at the same time, we conclude merely that the term in section 214 must be reasonably construed in a manner consistent with the constitutional provision.

The leading decision of *Stockton Civic Theatre* v. *Board of Supervisors, supra,* 66 Cal.2d 13, which gathers and harmonizes judicial definitions of the

term "charitable purposes," observes that "charity is not confined solely to the relief of the needy and destitute, but comprehends as well activities which are humanitarian in nature and rendered for the general improvement and betterment of mankind." Thus, a bequest is charitable if it has a purpose of "general social interest to mankind." (*Id.* at p. 19, internal quotation marks omitted.) Under this standard, the court upheld the tax exemption of a civic theater on the ground that it provided "benefits to the community" which "are of social interest to mankind and, when given to the community, are humanitarian in nature and contribute to the improvement and betterment of mankind." (*Id.* at p. 20.)

■ Implicit in this standard is the requirement that a charitable activity serve "either the community as a whole or an unascertainable and indefinite portion thereof." (*Stockton Civic Theatre* v. *Board of Supervisors, supra,* 66 Cal.2d at pp. 19-20, internal quotation marks omitted; *Estate of Henderson* (1941) 17 Cal.2d 853, 857 [112 P.2d 605].) It is true that the courts have approved the charitable tax exemption for certain institutions, such as private schools and homes for the aged, that serve a small number of people. (*Fifield Manor* v. *County of Los Angeles* (1961) 188 Cal.App.2d 1, 11 [10 Cal.Rptr. 242]; *Sarah Dix Hamlin School* v. *City etc. of San Francisco* (1963) 221 Cal.App.2d 336, 341 [34 Cal.Rptr. 376].) But in these cases, they have based the exemption on the theory that the institutions lessened "the burdens of government" (*Stockton Civic Theatre* v. *Board of Supervisors, supra,* 66 Cal.2d at p. 19, internal quotation marks omitted), to the benefit of the entire community, by performing a service that government would otherwise have been required to provide.

In a perceptive review of the case law, the court in *Peninsula Covenant Church* v. *County of San Mateo* (1979) 94 Cal.App.3d 382, 399 [156 Cal.Rptr. 431], concludes, "From these decisions, two dependent variables emerge as particularly important to the determination of the court: the nature of the use of property, and the degree to which the activity is open to the community as a whole. If the use is one which is deemed particularly necessary to the welfare of the community or is a service which the government otherwise would be compelled to provide for the community, such as a hospital or elementary school, it may be considered a charitable purpose even though only a small number of people are directly benefited. [Citations.] If, on the other hand, the activity serves educational or humanitarian goals and is open to all or virtually all of the community, it may be exempt even though it is not a necessary activity in the same sense as a hospital . . . ." We read the passage as saying that the two variables are to some extent dependent. If an institution serves an interest historically regarded as being closely tied to the public welfare, the courts may require no

more than indirect public benefit, such as possible tax savings. But if the institution's purpose has received relatively little recognition in judicial decisions and governmental programs, the courts will require a more direct and demonstrable benefit to the community at large.

■ Fees charged by an institution "will not necessarily prevent its classification as charitable if such sums 'go to pay the expenses of operation and not to the profit of the founders or shareholders' . . . ." (*Fredericka Home* v. *County of San Diego* (1950) 35 Cal.2d 789, 793 [221 P.2d 68].) "Both the constitutional provision and the statute contemplate that the exempt institution may have income and even 'net earnings' without losing the benefit of its exemption, provided such earnings are derived from the normal pursuit of its exempt purposes . . . ." (*Y. M. C. A.* v. *County of L. A.* (1950) 35 Cal.2d 760, 771 [221 P.2d 47].)

Nevertheless, the amount of fees may affect "the degree to which the activity is open to the community as a whole." (*Peninsula Covenant Church* v. *County of San Mateo, supra,* 94 Cal.App.3d at p. 399.) As we have seen, unless an institution performs a service relieving government of some obligation toward its citizens, the availability of the property tax exemption may depend on the extent that the institution confers benefits on the general community or a broad and indefinite segment thereof. Thus, in *Santa Catalina Island Conservancy* v. *County of Los Angeles* (1981) 126 Cal.App.3d 221, 241-242 [178 Cal.Rptr. 708], the court upheld the exemption, finding that certain fees did not effectively limit public access to a nature conservancy area on Santa Catalina Island which was visited by about 100,000 people per year. But in *Peninsula Covenant Church* v. *County of San Mateo, supra,* 94 Cal.App.3d at pages 399-400, the court denied the exemption on the ground that a membership fee effectively limited use of a swimming pool and tennis club to a closed and limited group.

Appellants concede "that certain programs that legitimately can be characterized as charitable take place at the New Oakland YMCA facility." We consider that these clearly include all youth programs, as well as the more limited senior citizen programs and the use of the facility by educational, philanthropic and civic organizations. All these activities are unquestionably "humanitarian in nature" and are offered in the "social interest" of the community without charge or at minimal fees that do not effectively limit public participation. The adult programs in athletics, physical fitness, wellness and recreation merit more careful analysis. We will examine first the existence of a charitable purpose and secondly the degree that the programs are open to the community at large.

■ We have no hesitation in saying that athletic programs and facilities may serve a charitable purpose; they not only benefit the physical health of

participants but improve the quality of life in a community. (See *Peninsula Covenant Church* v. *County of San Mateo, supra,* 94 Cal.App.3d 382, 400.) In this respect, an athletic center serves a purpose similar to the civic theater in *Stockton Civic Theatre* v. *Board of Supervisors, supra,* 66 Cal.2d 13. Both athletics and the theater are important cultural expressions that promote emotional, mental, and, in the case of athletics, physical well-being. The golden age of ancient Greece is remembered both for Sophocles and the Olympic games. It would be arbitrary to say that art deserves more support than sports; the two involve different dimensions of the life of the individual as well as the community. The public interest demands that the community offer both outlets to the creative energies of its citizens.

The courts have tended to recognize a charitable purpose in activities "of a type often supported by government." (*Stockton Civic Theatre* v. *Board of Supervisors, supra,* 66 Cal.2d 13, 20.) The underlying premise appears to be that, where government agencies actually support activities similar to those at issue, it may be easily inferred that they serve a social interest. Thus, in upholding a charitable property tax exemption, the *Stockton Civic Theatre* decision alludes to "the opera houses, municipal auditoriums, and orchestras maintained or supported by our cities." (*Ibid.*; see also *Greek Theatre Assn.* v. *County of Los Angeles* (1978) 76 Cal.App.3d 768, 777 [142 Cal.Rptr. 919].) We note that nearly all cities of any size have a parks and recreation department with responsibility to maintain playing fields and other athletic facilities.

Decisions in other jurisdictions have upheld the property tax exemption of community athletic facilities. In *Coeur D'Alene Pub. Golf Club* v. *Kootenai Bd.* (1984) 106 Idaho 104 [675 P.2d 819, 41 A.L.R.4th 955], the court upheld the property tax exemption of a community golf course operated by a "benevolent" organization, finding that the facility served "community social and physical needs." (*Id.,* 675 P.2d at p. 820.) An Illinois decision, *Decatur Sports Found.* v. *Dept. of Rev.* (1988) 171 Ill.App.3d 696 [126 Ill.Dec. 891, 532 N.E.2d 576], is still more closely on point. Like the YMCA, a foundation operated a sports complex including six baseball diamonds, a track for bicycle competition and a soccer field. Upholding its property tax exemption, the court observed that the foundation performed a service supplementing that of public park districts in the state.

We see no clear distinction between athletic activities and physical fitness programs. One of the public benefits of athletics lies in promoting physical health; and physical fitness activities often have an element of play similar to athletics. Though less common than playing fields, our municipal parks sometimes provide jogging paths or exercise stations. To the extent that

physical fitness programs place particular emphasis on the goal of health, they equally serve a charitable purpose. "[T]he promotion of health . . . is today generally seen as a charitable purpose." (*Harvard Com. Health Plan* v. *Bd. of Assessors* (1981) 384 Mass. 536 [427 N.E.2d 1159, 1163].) The physical education programs in our schools and the existence of a President's Council on Physical Fitness attest to the social interest in cultivating physical strength and vigor among our citizens.

The promotion of public health requires preventative measures as well as treatment of the ill; all public health programs from the federal to local level in fact provide programs ranging from vaccination to health education. To preserve good health, a few YMCA programs, such as cholesterol screening, directly provide a kind of preventative medicine that supplements that offered by public agencies. Other programs, such as cardiovascular workouts, serve a closely related goal by helping to maintain physical wellness. Whether or not such programs come strictly within the rubric of preventative medicine, they serve an essentially similar social interest.

In affirming a charitable property tax exemption, several decisions have mentioned the recreational value of the activity as an additional or associated benefit. (*Stockton Civic Theatre* v. *Board of Supervisors, supra,* 66 Cal.2d 13, 20 ["the educational and recreational benefit of the community as a whole"]; *Santa Catalina Island Conservancy* v. *County of Los Angeles, supra,* 126 Cal.App.3d 221, 237 ["preserving natural environments and recreational opportunities"]; *Greek Theatre Assn.* v. *County of Los Angeles, supra,* 76 Cal.App.3d 768, 777 ["an equal charitable use . . . in the . . . recreational benefit"].) It is true that we have found no decision characterizing an activity as charitable for its recreational value alone. But we find no suggestion in the cases that an activity may fail to serve a social interest if it exists purely for public enjoyment. The recreational values of YMCA activities are entirely compatible with its tax exemption.

The more difficult question concerns the degree that the adult programs at issue are open to the general public. In assessing this factor, we look to "actual use" rather than "intended use." (*Christward Ministry* v. *County of San Diego* (1969) 271 Cal.App.2d 805, 811 [76 Cal.Rptr. 854]; *Peninsula Covenant Church* v. *County of San Mateo, supra,* 94 Cal.App.3d 382, 396-397.) Even if the YMCA offers no formal barriers to public participation, it might still fail in its community outreach by poor public relations or by offering activities of particular, or exclusive, interest to existing members. In *YMCA* v. *Dept. of Rev.* (1989) 268 Ore. 633 [784 P.2d 1086], the Oregon Supreme Court denied the property tax exemption to two branches of the YMCA that, like the New Oakland YMCA, catered to

relatively affluent commuters working in the downtown area. The larger of the two facilities offered reduced fees to only about 5 percent of its 4,400 members. The last census reported over 300 families in its immediate vicinity with incomes less than $7,500, and 10,248 children between the ages of 5 and 15 residing within 3 miles. Although the decision rests on considerations peculiar to Oregon law, the California courts might well reach the same result on these facts.

In the case at bar, the record on this critical point is unfortunately very limited. We know only that the New Oakland YMCA charges standard membership fees that are beyond the financial capacity of a large segment of the population and that it offers reduced fees to 18 percent of its membership based in some manner on ability to pay. On these bare and ambiguous facts, it is clear that the New Oakland YMCA has a considerably stronger claim to an exemption than that of the two Portland branches. But if the adult programs for athletics, physical fitness, wellness and recreation were considered in isolation, it would still be a close question whether they sufficiently benefited the community as a whole to qualify for the property tax exemption.

■ We consider, however, that it would be unrealistic to analyze the degree of community benefit for each category of activity offered by the YMCA. It is true that a profitmaking enterprise, such as a gift shop, may not claim an exemption on the ground that it subsidizes other charitable activities or promotes a "general service plan." (*Cedars of Lebanon Hosp.* v. *County of L.A.* (1950) 35 Cal.2d 729, 745 [221 P.2d 31, 15 A.L.R.2d 1045]; *Y. M. C. A.* v. *County of L. A.*, *supra*, 35 Cal.2d 760, 775.) By the same logic, a distinct set of nonexempt activities should not be entitled to an exemption on the ground that they support related charitable programs. But appellants here have not identified any clearly nonexempt activity that is distinctly severable from other exempt activities. The record instead favors analyzing the YMCA as an integral unit. We note that it would generally be very difficult to separate a particular category of adult activity from other clearly charitable activities. All the activities are conducted in the same building; activities with varying claims to the exemption share the same rooms and equipment. The activities are directed by the same staff, and they often share the same sources of financial support and the same overhead costs.

Moreover, the record provides no compelling reason to attempt to distinguish between the programs. All the YMCA activities we have discussed have some potentially valid charitable purpose although some activities may concern a more vital social interest than others. Similarly, no activity caters merely to a closed group of dues-paying members although some activities,

particularly those offered to the youth, display more community outreach than others. It cannot be doubted that programs tend to interact with others in a synergistic manner. The success of one activity may help promote another as participants gain friends and learn of what the YMCA has to offer. A large membership in town makes possible a greater variety of programs. The YMCA will tend to succeed or fail as a complex of related activities, rather than as a collection of discrete programs.

In short, we consider that it is most practical and fair to consider the community benefit offered by the entire complex of facilities found in the New Oakland YMCA. This analytical approach provides no bright line revealing exempt or nonexempt status—the applicable standards remain vague—but it does indicate clearly enough the proper resolution of the present case. Viewing the New Oakland YMCA as a single complex and giving appropriate weight to its admirable youth programs, we hold that it satisfies the standard implicit in the statutory term "charitable purposes." It is immaterial under California law that some YMCA facilities compete with private health clubs. "A charitable enterprise does not lose its exemption merely because it engages in competition with businesses which are subject to taxation." (*Young Men's Christian Ass'n* v. *Department of Revenue* (1974) 268 Ore. 633 [522 P.2d 464, 465].) Thus, in *Y. M. C. A.* v. *County of L. A.*, *supra*, 35 Cal.2d 760, our high court affirmed the charitable tax exemption of a YMCA dormitory even though it competed with nearby residential hotels.

We conclude the Alameda County Tax Assessor and the State Board of Equalization properly determined that the New Oakland YMCA serves valid charitable purposes, benefiting the community as a whole, which qualify it for the charitable property tax exemption of Revenue and Taxation Code section 214.

The judgment is affirmed.

Strankman, P. J., and Stein, J. concurred.

Appellants' petition for review by the Supreme Court was denied September 24, 1992.